[No. C005616. Third Dist. June 22, 1990.]

CHARLES CROW, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA, Defendant and Repondent.

## COUNSEL

J. Michael Brown, Estelle A. Schleicher and E. Katherine Dashiell for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Richard D. Martland, Chief Assistant Attorney General, Darryl L. Doke, Stephen J. Egan and Thomas McCrackin, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**SPARKS, Acting P. J.**—Plaintiff Charles Crow filed a multicount complaint naming as defendants the State of California, California State University Sacramento (CSUS) and its trustees, as well as other individual and fictitious defendants. The public entity defendants, whom we shall collectively refer to as CSUS, successfully moved for summary judgment. The plaintiff appeals from the judgment dismissing his complaint as to CSUS. We shall affirm.

### THE PLEADINGS AND SUMMARY JUDGMENT MOTION

Although this is an appeal from a summary judgment motion, the material facts are not in dispute. Thus, the three-step paradigm for summary judgments (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203]) boils down to the simple question of whether CSUS is entitled to judgment as a matter of law on these facts.

During the fall term of 1985, the plaintiff was a student at the Sacramento campus of the California State University and a resident of Sutter Hall, a dormitory located on the campus. Although the document has never actually been produced, the complaint alleged (and we accept for purposes of argument) that the plaintiff had signed a written residency agreement with the university for occupancy in Sutter Hall for the 1985-1986 academic

year, which incorporated by reference a set of guidelines entitled "Rules, Regulations, and Policies for Use of Residence Halls and Dining Commons." These guidelines in turn provided that "[p]hysical or verbal abuse or abusive behavior directed toward . . . other students will not be tolerated."

George Saipole was another university student and Sutter Hall resident who happened to be the starting nose guard on the university's football team and, perhaps not surprisingly, to have worked as a bouncer. Mr. Saipole lived directly over the plaintiff; they were vaguely acquainted. On October 27, 1985, Mr. Saipole got drunk and assaulted a residence hall adviser who declined to press charges. The director of dormitories, Gary Webbenhurst, told Mr. Saipole this was unacceptable behavior which would be grounds for termination of his scholarship and expulsion from the university. He was also excoriated by one of his coaches. However, no discipline was actually imposed.

At about 1 a.m. on December 14, 1985, the plaintiff went to a keg party in another dormitory, Draper Hall. He had drunk a half-glass of beer when Mr. Saipole arrived. The football player forced first another person and then the plaintiff to drink more beer. Shortly afterward (for reasons Mr. Saipole could not remember later), he punched the much slighter plaintiff in the face and threw him against the wall, poured beer all over him, and then continued to punch and kick the plaintiff.

In March 1986, the plaintiff filed a claim with the State Board of Control detailing his account of the attack (which we will shortly recount) and demanding recompense for medical expenses and loss of earnings. In December 1986, he filed his complaint. In it, he alleged four causes of action, only three of which involve defendant State. The first stated the plaintiff was "visiting friends and fellow students in Draper Hall . . . ; at said time and place the defendants . . . so negligently and carelessly owned[,] operated, maintained and supervised said dormitories and residence hall as to allow the defendant George Ace Saip[o]le to attack, beat and assault the plaintiff . . . . [¶] That at all times herein mentioned the defendants . . . knew of the vicious and dangerous propensities of . . . Saip[o]le; . . . [¶] That [notwithstanding] that the said defendants . . . failed, refused and neglected to take any action to prevent said . . . Saip[o]le from continuing in his vicious and dangerous propensities and to prevent the attack, assault and battery on plaintiff." The third cause of action, referring to the previously mentioned dormitory residence agreement, averred, "Said written agreement . . . constituted a warrant of habitability of said dormitory premises and was relied upon by plaintiff in the selection of said dormitory premises as a safe and secure place to live . . . ; that the conduct of defendants . . . as hereinabove alleged . . . constituted a breach of said warranty of

habitability . . . ." Finally, the fourth cause of action alleged the defendants "represented to plaintiff that the campus . . . and the dormitories thereon were reasonably safe and secure for residence by students . . . and that said defendants would abide by and enforce rules and procedures for the safety of said students. [¶] That said representations . . . were negligently and falsely made . . . . [¶] That in commencing residence . . . plaintiff relied on said negligent false representations . . . in choosing residence in said dormitory over other available housing; . . ." Although the representations were not specified in the complaint, the plaintiff suggests none other than the residence agreement.

The CSUS defendants answered in May 1987. Following the depositions of the plaintiff and Mr. Saipole in January and April 1988, those defendants moved for summary judgment in July 1988. In its moving papers, CSUS argued that it owed no legal duty to plaintiff, that he had failed to state a cause of action under his claim and that there was no triable issue of fact. CSUS argued that it was under no duty to control the acts of adult students and that immunity was conferred upon it by virtue of Government Code sections 845, 846, and 818.6. The trial court found the first cause of action did not state a claim under Government Code section 835 (undesignated section references will be to this code) for maintenance of a dangerous condition on public property because a third party could not be a "dangerous condition." The court also found the third and fourth causes of action were barred as exceeding the scope of the claim filed with the Board of Control. This appeal followed.

DISCUSSION

I

*The theories "based on" contract now are barred as not within the ambit of the claim.*

Both below and on appeal the plaintiff has claimed his third and fourth causes of action are "contractual" causes of action based on the alleged dormitory residence agreement between himself and CSUS, describing them as "aris[ing] from the written contract between himself and Respondents for use of the student housing." Given the relief sought in the complaint, we believe he actually is suing in tort, using the existence of the contract to provide the necessary duty elements. But we need not resolve this "duck-rabbit" question. (See *Perry* v. *Robertson* (1988) 201 Cal.App.3d 333, 335, fn. 1 [247 Cal.Rptr. 74].) In accordance with a line of cases, which we recently lengthened with this court's decision in *Blair* v. *Superior Court* (1990) 218 Cal.App.3d 221 [267 Cal.Rptr. 13], CSUS is correct these causes

of action may not proceed because there were no direct or inferential facts in the claim filed with the Board of Control which would support them.

Under the Tort Claims Act,[1] "There shall be presented in accordance with Chapter 1 [§ 900 et seq.] and Chapter 2 [§ 910 et seq.] of [Part 3] all claims for money or damages against the state: . . . (c) For money or damages (1) on express contract, or (2) for an injury for which the state is liable." (§ 905.2; see also § 905.) ■ Thus, although actions arising out of contract are not affected by the immunities and liabilities in part 2 of the Tort Claims Act (§ 814), they are nonetheless subject to its procedural requirements. (*White* v. *State of California* (1987) 195 Cal.App.3d 452, 477 [240 Cal.Rptr. 732]; *Loehr* v. *Ventura County Community College Dist.* (1983) 147 Cal.App.3d 1071, 1079 [195 Cal.Rptr. 576].) It goes without saying that any tort cause of action must similarly meet this requirement.

Section 910 prescribes the contents of the claim, including the name and address of the claimant; the date, place, and circumstances of the occurrence "or transaction" giving rise to the claim; a general description of the injury, damage, or loss incurred; and the amount of the claim. The entity must act to grant or deny the claim within a specified period, after which it is deemed denied. (§§ 912.4-912.8.) In enforcement of the claim filing requirement, "no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented in accordance with Chapter 1 [§ 900 et seq.] or Chapter 2 [§ 910 et seq.] of Part 3 of this division [3.6] until a written claim therefor has been presented to the public entity and has been acted upon by the board or has been deemed to have been rejected by the board . . . ."[2] (§ 945.4.)

■ As a result, there is a sympathetic bond between the administrative claim and the judicial complaint. "If a plaintiff relies on more than one theory of recovery against the [State], each cause of action must have been reflected in a timely claim. In addition, the factual circumstances set forth in the written claim must correspond with the facts alleged in the complaint; even if the claim were timely, the complaint is vulnerable to a

---

[1] This is the informal short title for division 3.6 of the Government Code (§ 810 et seq.), which is comprised of substantive noncontractual liabilities and immunities of public entities (parts 1 and 2) and procedural provisions for claims, actions, and judgments against public entities (parts 3, 4, and 5), as well as other matters. (Van Alstyne, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1980) §§ 2.1, 2.5, pp. 31, 34-35 [hereafter, *Van Alstyne*].)

[2] The exceptions to this bar are where the public entity has not provided accurate information to the Roster of Public Entities in the Secretary of State's office (§ 946.4) or where the claimant had petitioned the public entity for leave to file a late claim within a year of the accrual of the action, the entity then denied the claim through positive action or through inaction, and the court then gave leave to be exempted from the claim requirement (§§ 911.4-911.8, 946.6).

demurrer [or a motion for judgment on the pleadings] if it alleges a factual basis for recovery which is not fairly reflected in the written claim." (*Fall River Joint Unified School Dist.* v. *Superior Court* (1988) 206 Cal.App.3d 431, 434 [253 Cal.Rptr. 587] [citations & internal quotation marks deleted].) As we summarized it most recently, "in each of the [cited] decisions the plaintiff did not merely elaborate or add further detail [in the complaint] to a claim which was predicated on the same fundamental facts set forth in the complaint. Rather, there was a complete shift in allegation, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim." (*Blair, supra*, 218 Cal.App.3d at p. 226.) *Blair*, distinguishing itself from these decisions, found the facts underlying the complaint before it to have been present in the claim filed with the Board of Control. (*Ibid.*)

Nevertheless, the cited cases are instructive and we briefly recount them here. *Fall River Joint Unified School Dist., supra*, 206 Cal.App.3d 431, did not allow a cause of action to proceed for negligent supervision of horse-playing schoolchildren because that exceeded the scope of a claim based on the dangerous condition of a school door. (206 Cal.App.3d at pp. 434-435.) *Donohue* v. *State of California* (1986) 178 Cal.App.3d 795, 804 [224 Cal.Rptr. 57], found a claim describing negligence in permitting an uninsured motorist to take a driving test would not support a complaint alleging negligence in the supervision of the driving test. Similarly, *Lopez* v. *Southern Cal. Permanente Medical Group* (1981) 115 Cal.App.3d 673, 676-677 [171 Cal.Rptr. 527], found a claim asserting negligence in issuing a driver's license despite knowledge of epilepsy did not support a cause of action based on permitting the driver to keep his license despite failures to comply with accident-reporting and financial-responsibility requirements. *Nelson* v. *State of California* (1982) 139 Cal.App.3d 72, 80-81 [188 Cal.Rptr. 479], held a cause of action for failing to summon medical assistance for an inmate was not embraced within a claim describing medical malpractice by the treating physician. In *Shelton* v. *Superior Court* (1976) 56 Cal.App.3d 66, 82-83 [128 Cal.Rptr. 454], the court held a claim for personal injuries would not support a cause of action for loss of a coplaintiff's consortium. Finally, *Connelly* v. *State of California* (1970) 3 Cal.App.3d 744, 753 [84 Cal.Rptr. 257], ruled a claim stating negligent provision of water level information did not support a cause of action alleging negligent maintenance of the dam.

*Moore* v. *State of California* (1984) 157 Cal.App.3d 715 [203 Cal.Rptr. 847], cited by the plaintiff, is inapposite. "The circumstances of this case are unusual if not unprecedented: Ms. Moore filed a *timely* claim for damages for her injuries but was required to follow the Government Code's procedures for *late* claims after the lawsuit based upon her timely, rejected claim

was dismissed on the grounds that that claim did not sufficiently embrace the cause of action pled." (*Id*. at pp. 718-719 [italics in original].) The case consequently turns on whether counsel's neglect was "excusable" for purposes of late claim filing (*id*. at pp. 721-725), *not* whether the claim had been sufficient to support the complaint; the appeal was not from the demurrer to the original complaint on the timely claim (*id*. at pp. 720, 724-725). The case thus has no bearing on the adequacy of plaintiff's claim.

■ Under the standards set forth in these cases, the facts in plaintiff's claim—even viewed most liberally in his favor—cannot support any cause of action based on a contract between himself and CSUS, whether as a contract cause of action or as one in tort which relies on a contract as a fact necessary to establish an element. The pertinent part of the plaintiff's Board of Control claim reads:

"(5) Date of Occurrence:

"December 14, 1985

"Place of Occurrence:

"Draper Hall, California State University Sacramento, CA

"(6) Circumstances of Occurrence:

"Student at California State University, known to the University to be dangerous to other students and known by California State University to have a history of assaulting other students in dorm[i]tories assaulted claimant [while] in the Dra[p]er Hall dorm[i]tory.

"(7) General Description of Injury, Damage, or Loss Incurred:

"Personal injuries including but not limited to facial fractures."

The claim thus simply identified the plaintiff as having been assaulted in the Draper Hall dormitory. It takes an inferential leap to recognize from this allegation that the plaintiff was even a student at the university as opposed to a mere nonstudent visitor. But there is absolutely no fact in this description from which CSUS could determine if either (1) the plaintiff was an on-campus student seeking damages under his contract with the university, or (2) it had a duty created by the contract or a landlord/tenant "special relationship" with the plaintiff by reason of the contract, or (3) it had made a misrepresentation of safety to him in the contract, all of which require the contract as the necessary "occurrence or transaction [giving]

rise to the claim asserted." (§ 910.) This lacuna defeats the purpose of the statute, which is to give the public entity the opportunity to evaluate the merit and extent of its liability and determine whether to grant the claim without the expenses of litigation. (*Donohue, supra,* 178 Cal.App.3d at p. 804.) CSUS might well have concluded it had no liability for injuries in a fracas to one who was either an off-campus student or a mere visitor, while the new facts of a contractual guaranty of safety conceivably might have changed its position.

The plaintiff attempts to find refuge from the effects of noncompliance by resort to several of the doctrines (detailed in *Van Alstyne,* § 5.43 et seq.) which excuse noncompliance.

■ The first of these, "substantial compliance" with the statutory provisions, has repeatedly been held by courts to be inapplicable when the factual basis for a cause of action is wholly absent from the claim (as opposed to being described inaccurately). (*Fall River Joint Unified School Dist., supra,* 206 Cal.App.3d at pp. 435-436; *Van Alstyne,* § 5.44, pp. 493-496.)

■ The next of these is a "waiver" argument based on sections 910.8 and 911, which provide in respective pertinent part, "If in the opinion of the board . . . a claim as presented fails to comply substantially with the requirements of Sections 910 and 910.2 . . . , the board . . . may, at any time within 20 days after the claim is presented, give written notice of its insufficiency," and "Any defense as to the sufficiency of the claim based upon a defect or omission in the claim as presented is waived by failure to give notice of insufficiency with respect to such defect or omission as provided in Section 910.8, . . ." These statutes have no applicability to these circumstances. The state does not assert the claim has some inherent flaw; rather, it simply does not support the complaint, an event postdating the claim by some time. As the court stated in *Donohue,* "Plaintiff notes that the State Board of Control could have given him written notice of any insufficiency in his claim and argues that the board's failure to do so resulted in the waiver of any defense as to the sufficiency of the claim . . . . The contention lacks merit. The insufficiency of plaintiff's claim lies in its failure to set forth the factual basis for recovery alleged in the complaint; defendant could not have discovered such defect until plaintiff filed his complaint." (*Donohue, supra,* 178 Cal.App.3d at p. 805.) Here, CSUS asserted in its answer to the complaint the affirmative defense of an improper enlargement of the factual basis of the claim. CSUS then chose to move for summary judgment, including this ground among its arsenal of arguments. The plaintiff again cites *Moore;* however, for the reasons already stated, we again note it is inapposite. As for *Foster* v. *McFadden* (1973) 30 Cal.App.3d

943 [106 Cal.Rptr. 685], the case is concerned with the asserted *initial* inadequacy of a letter to act as a claim, not a disharmony between the facts of a claim and the facts of a complaint. Thus, CSUS acted in timely fashion to assert this defense, with no waiver taking place.

Finally, the plaintiff claims an estoppel against CSUS, citing no particular authority but generally complaining under *Tammen* v. *County of San Diego* (1967) 66 Cal.2d 468, 480 [58 Cal.Rptr. 249, 426 P.2d 753], that by the state's delay in raising the argument until the summary judgment motion the plaintiff was lulled to his detriment in that he was prevented from filing for the opportunity to "pursue his complaint without a claim," as he characterizes the effect of section 946.6. However, there can be no detrimental reliance because there *was* no action the plaintiff was lulled into forebearing. Section 946.6 does not allow a complaint to proceed without a claim, as the plaintiff characterizes it; rather, it *only* excuses the lack of a claim where a plaintiff has *filed with the relevant entity a petition for leave to present a late claim*, which must be done within a year of the accrual of the cause of action. (§§ 911.4, 946.6.) As more than a year from the attack had expired as of the date the plaintiff filed his complaint, he never could have filed a section 911.4 petition with the entity, could not have filed for section 946.6 relief from the claim prerequisite, and thus did not give up any ameliorative actions before the motion for summary judgment was filed. No estoppel can be present as a result.

Consequently, the causes of action relying on the residence contract are barred. We now consider the remaining cause of action in tort.

## II

### *No liability for tortious acts of third party*

█ In order to determine whether a tort claim may be maintained against a public entity, the paradigm for analysis ordinarily requires we proceed by first identifying a duty on the part of the entity, then ascertain a statutory basis for liability, and then finally determine whether any statutory immunities are applicable. (*Rodriquez* v. *Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 723 [230 Cal.Rptr. 823].)

But because plaintiff has seemingly predicated his noncontractual claim upon the problematical existence of a dangerous condition of public property, we depart from that paradigm and begin by putting the liability cart before the duty horse. (Cf. *Williams* v. *State of California* (1983) 34 Cal.3d 18, 22 [192 Cal.Rptr. 233, 664 P.2d 137].)

■ As plaintiff acknowledged below, he sought recovery of damages against CSUS on three theories, two of which were exclusively grounded upon the claim-barred written landlord/tenant contract. The third theory, the one we are concerned with here, was said to be based upon an alleged dangerous condition of the dormitory where the attack occurred. "The dormitories at California State University Sacramento," plaintiff asserted in his opposition to the summary judgment motion, "were in a dangerous and defective condition in that the University, knowing that defendant Saipole was a danger to other students in the dormitories, failed to control him, failed to warn other students about him, failed to enforce its own rules and failed to secure the dormitories from intrusion by persons such as Saipole who were known to be a hazard to other students. As a resident of the dormitory, plaintiff was entitled to that protection pursuant to the land-lord/tenant relationship as well as the unique relationship created by virtue of his status as a student at California State University Sacramento." Thus, as plaintiff sees it, this "is simply a case of the University failing to maintain its property, the dormitories, in a safe condition for the lawful use of student residents such as the plaintiff Charles Crow." "Under Government Code § 830, and following sections," plaintiff asserted, "the public entity is liable if the plaintiff establishes that the property was in a dangerous condition; the dangerous [condition] contributed to the injury; it was reasonably foreseeable the injury could occur and the public entity either created the condition or had actual [or] constructive notice of the condition."

Section 835, the controlling statute for liability for dangerous condition of public property, reads: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either: [¶] (a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or [¶] (b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." A dangerous condition is statutorily defined as "a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." (§ 830, subd. (a).)

In support of its motion below, CSUS argued that there was no evidence that "the dorm premises were in a physically defective condition at the time

of plaintiff's injury." In the view of CSUS, plaintiff "has not alleged *any* physical defect in the property that created a dangerous condition, the dangerous condition is in fact an alleged dangerous person." (Italics in original.) Consequently, liability could not be based upon the dangerous condition of public property statute. The trial court agreed. "Government Code Section 835 does not include an action where the 'dangerous condition' is a third party."

This assessment of liability based upon a dangerous condition was correct. In *Peterson* v. *San Francisco Community College Dist.* (1984) 36 Cal.3d 799 [205 Cal.Rptr. 842, 685 P.2d 1193], the high court noted that the "majority of cases which have construed these provisions [of the Government Code relating to dangerous conditions] have concluded that third party conduct by itself, unrelated to the condition of the property, does not constitute a 'dangerous condition' for which a public entity may be held liable. The cases so holding have relied primarily on policy considerations and the definition of dangerous condition as a 'condition of *property*' for the conclusion that a defect in property is necessary in order to state a cause of action based on wrongful conduct of third parties." (*Id.* at p. 810-811 [citations omitted & italics in original].)

Impliedly conceding this point, plaintiff notes that "[a]lthough the provisions of Section 835 are most frequently applied where there is a physical defect in the structure of the property itself, the criminal acts of a third party have been construed as a dangerous condition of property and liability has been imposed on a public entity where there is a combination of a defect in the property and criminal acts of third parties." We agree that when a defect in the property abets, or is at least causally linked to, the criminal attack, liability may be imposed under the dangerous condition of property statute. Thus, the *Peterson* court held that the state could be liable under section 835 for a criminal assault by a third party when "the defendants maintained the property in such a way so as to increase the risk of criminal activity." (36 Cal.3d at p. 812.) There plaintiff had alleged that "the property was in a dangerous condition because the thick and untrimmed foliage and trees around the parking lot and stairway permitted the assailant to perpetrate his crime; she further alleges that defendants were aware of the condition and failed to take reasonable protective measures, including trimming the foliage or warning her of the danger." (*Ibid.* [fn. omitted].) Under these circumstances, the court "conclude[d] that plaintiff has stated a cause of action under the provisions of the Tort Claims Act." (*Id.* at p. 813.) But when there is no causal link between a dangerous condition and the injury, liability cannot be predicated upon the dangerous condition of property statute. (*Constance B.* v. *State of California* (1986) 178 Cal.App.3d 200, 210-211 [223 Cal.Rptr. 645].) As the high court explained in *Hayes* v. *State*

*of California* (1974) 11 Cal.3d 469 [113 Cal.Rptr. 599, 521 P.2d 855], "[l]iability for injury caused by a dangerous condition of property has been imposed when an unreasonable risk of harm is created by a *combination* of defect in the property and acts of third parties. However, courts have consistently refused to characterize harmful third party conduct as a dangerous condition—absent some concurrent contributing defect in the property itself." (*Id.* at p. 472 [citations & fn. omitted, italics in original].)

Plaintiff has not identified any defect in the dormitory which contributed to the injuries he sustained. Indeed, he concedes that the summary judgment record contains no such evidence. Instead, he argues that liability should nevertheless be imposed for the policy reasons articulated by the *Peterson* court. "Although the facts established at the instant summary judgment do not include a physical defect in the structure of the CSUS campus, for all the policy reasons stated in *Peterson*, liability ought to be imposed on Respondents in this case." The argument is unavailing. The policy of this state concerning governmental tort liability is expressed in the Tort Claims Act (§ 810 et seq.) and it requires the imposition of liability by statute. (§ 815, subd. (a).)[3] Nothing in the language of the *Peterson* case suggests that liability may be imposed upon a public entity in the absence of a statute authorizing that imposition. In sum, "[i]f the risk of injury from third parties is in no way increased or intensified by any physical defect of the public property, the courts ordinarily decline to ascribe the resulting injury to a dangerous condition of the property." (*Van Alstyne*, § 3.8, p. 189.)

■ Ordinarily, whether a given set of facts or circumstances creates a dangerous condition of public property within the meaning of the statute poses a question of fact. When, however, reasonable minds can come to only one conclusion on those facts, the question becomes one of law. (*Peterson, supra*, 36 Cal.3d at p. 810.) ■ Since no factual showing was made that a defect in the dormitory contributed to plaintiff's injury, the issue became one of law and the trial court correctly ruled that liability could not be predicated upon the dangerous condition of property statute.

■ Although plaintiff's theory of recovery for his noncontractual claim was asserted to be bottomed on the dangerous condition of property statute, his complaint was not expressly limited to that theory. Indeed, the first cause of action, the one at issue here, did not even mention a dangerous condition of property and was ostensibly based upon negligence. Moreover, plaintiff's opposition below and his brief in this court are replete with

---

[3] Section 815 provides in relevant part: "Except as otherwise provided by statute: [¶] (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."

arguments based upon the claimed liability of CSUS for its negligent operation and supervision of the dormitories. ■ It is true that on appellate review of a summary judgment, "issues raised and then abandoned in the trial court . . . cannot be considered on appeal." (*Johanson Transportation Service* v. *Rich Pik'd Rite, Inc.* (1985) 164 Cal.App.3d 583, 588 [210 Cal.Rptr. 433].) It is also true that "possible theories that were not fully developed or factually presented to the trial court cannot create a 'triable issue' on appeal." (*American Continental Ins. Co.* v. *C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1281 [241 Cal.Rptr. 466].) ■ But given the equivocal nature of plaintiff's assertion of liability, we are unable to conclude that he waived the negligence claim or that it was not fully developed in the court below. ■ When, as here, the defendant is the moving party on a motion for summary judgment, "his task is to negate completely an essential element of plaintiff's case or to establish a complete defense. This task is limited to addressing those issues or theories of liability raised in plaintiff's complaint." (*Fireman's Fund Ins. Co.* v. *City of Turlock* (1985) 170 Cal.App.3d 988, 994 [216 Cal.Rptr. 796] [citation omitted].) ■ Since plaintiff pled in his first cause of action that CSUS "negligently and carelessly owned[,] operated, maintained and supervised said dormitories and residence hall," CSUS bore the burden of negating the claim for negligence. We turn then to the question of negligence.

Once again we begin with the question of liability. Plaintiff alleged that each defendant, including fictitious ones, was "the agent and employee, or principle [*sic*] and employer of each of the other defendants and were at all times mentioned herein acting within the course and scope of said agency and employment." Thus, plaintiff seeks to impose liability upon CSUS on a theory of respondeat superior. As we noted in *Leger* v. *Stockton Unified School Dist.* (1988) 202 Cal.App.3d 1448 [249 Cal.Rptr. 688], "Section 820 [of the Government Code] provides in relevant part that except as otherwise statutorily provided, 'a public employee is liable for injury caused by his act or omission to the same extent as a private person.' Section 815.2 provides in pertinent part that the entity 'is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee . . . .' ■ Thus, the 'general rule is that an employee of a public entity is liable for his torts to the same extent as a private person and the public entity is vicariously liable for any injury which its employee causes to the same extent as a private employer.' " (*Id.* at p. 1461 [citations omitted].)

■ We turn then to the liability of a private person for the criminal acts of a third party. "[W]here a complaint alleges injuries resulting from the criminal acts of third persons[,] as here, the common law, reluctant to

impose liability for nonfeasance, generally does not impose a duty upon a defendant to control the conduct of another, or to warn of such conduct, unless the defendant stands in some special relationship either to the person whose conduct needs to be controlled, or to the foreseeable victim of such conduct." (*Inglewood Unified School Dist., supra*, 186 Cal.App.3d at p. 712 [citations omitted & italics deleted].) A form of special relationship can be created where one, either expressly or by conduct, voluntarily assumes a protective duty to another and either causes or increases the nature of any risk or causes harm because of reliance by the other. (*Williams, supra*, 34 Cal.3d at pp. 23-25; *Van Alstyne* (1989 supp.) § 2.64, pp. 56-60.)

Plaintiff first argues that a special relationship was forged out the landlord/tenant contract. Thus he contends that the landlord/tenant relationship between himself and CSUS created an affirmative duty to protect him. (See, e.g., *Kwaitkowski* v. *Superior Trading Co.* (1981) 123 Cal.App.3d 324 [176 Cal.Rptr. 494].) But this claim, as stated previously, is foreclosed by the failure of the Board of Control claim to contain any facts with respect to plaintiff's status as a residential student.

Citing our decision in *Leger* for the first time, plaintiff contended at oral argument that his affiliation with the university as a student created such a special relationship. That claim of a university/student special relationship must fail under the facts of this case. In *Leger*, we held that a high school district had a duty to protect a student from attack by a nonstudent in a school restroom under the facts alleged. We noted that attendance at high school is mandatory and that school officials are directly in charge of the children and their environs. We further emphasized that the district knew or should have known that plaintiff was subject to an unusual risk of harm at a specific location on school grounds. (*Leger, supra*, 202 Cal.App.3d at p. 1459.) Here, in contrast, plaintiff was an adult college student voluntarily participating in drinking beer at the dormitory. No claim was made that the CSUS knew or should have known of any particular risk of harm at this particular dormitory. As the high court explained in *Peterson*, "in some instances the relationship of a school district to its students gives rise to a duty of care." (36 Cal.3d at pp. 806-807, fn. 3.) Thus the *Peterson* court noted that in *Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741 [87 Cal.Rptr. 376, 470 P.2d 360], it had found a duty "in the context of a secondary school where a 16-year-old was killed while engaged in a 'slap boxing match.' [It] observed that children of that age 'should not be expected to exhibit that degree of discretion, judgment, and concern for the safety of themselves and others which we associate with full maturity.'" (36 Cal.3d at pp. 806-807, fn. 3.) But such a case must be distinguished from one involving college students because it "does not implicate the duty to

supervise the activities of students who are too immature to exercise judgment for their personal safety." (*Ibid.*)

This distinction between young, immature schoolchildren in grammar and high schools on the one hand and adult students in colleges and universities on the other was highlighted in *Baldwin* v. *Zoradi* (1981) 123 Cal.App.3d 275 [176 Cal.Rptr. 809]. There a state university student brought a damage action against the trustees and two dormitory advisors for injuries she sustained when fellow students engaged in a speed contest in their cars after a drinking party in the dorm. The court held that the relationship between the trustees and the university students did not create a special relationship imposing a duty of care to prevent the injuries sustained by plaintiff. In reaching this conclusion, the *Baldwin* court noted that "college administrators no longer control the general area of general morals. Students have insisted upon expanded rights of privacy, including liberal, if not unlimited, [parietal] visiting hours. The students had attained majority, with all the rights accorded to them save the right to consume alcoholic beverages . . . . 'At one time, exercising their rights and duties *in loco parentis*, colleges were able to impose strict regulations. But today students vigorously claim the right to define and regulate their own lives.' " (*Id.* at p. 287.) Given these realities of modern college life, the university does not undertake a duty of care to safeguard its student from the risks of harm flowing from the use of alcoholic beverages. "The transfer of prerogatives and rights from college administrators to the students is salubrious," the *Baldwin* court concluded, "when seen in the context of a proper goal of postsecondary education—the maturation of the students. Only by giving them responsibilities can students grow into responsible adulthood. Although the alleged lack of supervision had a disastrous result to this plaintiff, the overall policy of stimulating student growth is in the public interest." (*Id.* at p. 291.) Moreover, imposition of such a duty would be unwarranted and impracticable. "In respect to the burden to the [university] and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, it would be difficult to so police a modern university campus as to eradicate alcoholic ingestion." (*Id.* at p. 290.) We agree with the assessment of CSUS that it could "not have prevented this incident from taking place except *possibly* by posting guards in each dorm room on a 24-hour, 365-day per year basis." (Italics in original.) All these factors militate against the imposition of a legal duty upon CSUS under these circumstances.

In light of this analysis, we need not discuss any immunities of CSUS. And since the flaws in plaintiff's theories—the lack of a dangerous condition of public property or special relationship imposing a duty—cannot be

cured, there was no abuse of discretion in denying the plaintiff a continuance for additional discovery.

## DISPOSITION

The judgment is affirmed.

Marler, J., and Davis, J., concurred.