[No. C052703. Third Dist. Sept. 25, 2007.]

JAMES PATTERSON, Plaintiff and Appellant, v.
SACRAMENTO CITY UNIFIED SCHOOL DISTRICT, Defendant and
Respondent.

## COUNSEL

Gurnee & Daniels, Jerry M. Duncan, John A. Mason; Cable Law Offices and Keith D. Cable for Plaintiff and Appellant.

LaPlante, Spinelli, Donald & Nott, Domenic D. Spinelli and Crystal L. Waitkus for Defendant and Respondent.

## OPINION

**CANTIL-SAKAUYE, J.**—Plaintiff James Patterson was injured while participating in a truckdriver training course. Defendant Sacramento City Unified School District (District) offered the course as part of its adult education program. Patterson sued the District for negligent supervision. The trial court granted the District's motion for summary judgment, ruling that the doctrine of primary assumption of risk barred Patterson's negligence claim.

On appeal, Patterson contends judgment must be reversed because (1) the court improperly overruled a finding of duty in the District's first summary judgment motion; (2) assumption of risk does not apply in the circumstances of this case; and (3) even if the assumption of risk doctrine applies, there are triable issues of fact on whether the District acted recklessly. We agree with plaintiff that assumption of the risk does not apply in these circumstances and shall reverse the judgment.

## FACTUAL BACKGROUND

In spring 2003, Patterson enrolled in the District's California Heavy Duty Truck Driving Program. The truck driving course provided students with the training and hands-on experience they needed to become professional truck-drivers. It consisted of three six-week segments: classroom instruction; hands-on training; and on-the-road experience. In order to pass the course, students were required to participate in community service projects as part of their hands-on training and on-the-road experience.

The District assigned credentialed heavy-duty truck driving instructors to teach each segment of the course. Joe Arcuri and Ward Allen taught the second and third segments. Allen also served as field instructor and supervisor for the community service projects.

On May 9, 2003, during the first week of the hands-on segment of the training course, Patterson and several other students participated in a community service project which involved picking up bleachers from several locations, loading them onto a flatbed trailer attached to a tractor, and transporting them to the site of a rugby tournament. The classroom curriculum covered freight loading in a basic sense, but did not cover the specifics of loading flatbed trucks or trailers. According to the instructors, a primary goal of the community service assignment was to teach students how to load the trailers safely. The instructors described the loading of cargo as a "hands-on kind of thing" that involved common sense. The instructors typically critiqued the students after they loaded the cargo.

Allen was responsible for instructing Patterson and the other students on loading the bleachers on the flatbed trailer. The bed of the trailer was between 96 and 102 inches wide and approximately five feet off the ground. Allen was present when the students picked up aluminum bleachers at the first location and loaded them on the trailer without incident. He told the students to pick up the bleachers at the second location on their own. Allen did not know how much prior training or experience his students had in loading trailers.

The bleachers at the second location were made of heavy wood. Allen had not seen the wooden bleachers before assigning the students to pick them up. Because there were no teachers present, and none of the students was considered to be in charge, the unsupervised students decided as a group how to load the wooden bleachers. It took six students to carry each section of wooden bleachers. Patterson and a student named Don Cruse stood on the trailer bed. Patterson had never climbed on the flatbed trailer before he and the other students arrived at the second pickup location. Patterson and Cruse pulled on the wooden bleachers while the remaining students pushed the

bleachers from below. Patterson cautioned the students who were pushing to slow down when he recognized that he was running out of room at the edge of the trailer. Instead, the students gave the bleachers "one big push," and Patterson fell backward off the trailer.

## DISCUSSION

## I.

### *Standard of Review*

The trial court shall grant a defendant's motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the [defendant] is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)[1] A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (§ 437c, subd. (p)(2).) Once the defendant has made the required showing, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or defense. (*Ibid.*; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

" 'When a defendant moves for summary judgment on the basis of implied assumption of the risk, he or she has the burden of establishing the plaintiff's primary assumption of the risk by demonstrating that the defendant owed no legal duty to the plaintiff to prevent the harm of which the plaintiff complains.' [Citation.] Determining whether the primary assumption of risk doctrine applies is a legal question to be decided by the court. (*Knight* [*v. Jewett* (1992) 3 Cal.4th 296, 313 [11 Cal.Rptr.2d 2, 834 P.2d 696]]; [citation].)" (*Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1217 [130 Cal.Rptr.2d 198].)

On appeal from the entry of summary judgment, we review the record de novo "to determine whether the moving party was entitled to summary judgment as a matter of law or whether genuine issues of material fact remain. [Citation.]" (*Campbell v. Derylo* (1999) 75 Cal.App.4th 823, 826 [89 Cal.Rptr.2d 519].)

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

## II.

### *The Second Motion for Summary Judgment*

Judge Cecil heard the District's first motion for summary judgment in September 2005. At that point in the proceedings, the District argued that there was no statutory basis for imposing liability "for negligent supervision, training, and instruction of adult students and general negligence as a matter of law . . . ." Judge Cecil denied the motion in a ruling that referred to Government Code sections 815 and 820 and read in part: "The facts are sufficient to show there was a duty on the part of the school district's employees to properly supervise and instruct plaintiff on the loading of wooden bleachers on a flat bed trailer." Patterson argues that by considering and granting the District's second motion for summary judgment in March 2006, Judge Chang improperly overruled Judge Cecil's earlier ruling. There is no merit in this argument.

Code of Civil Procedure section 437c, subdivision (f)(2) states that a party may not move for summary judgment based on issues asserted in a prior motion for summary adjudication. To determine whether a second summary judgment motion is proper, courts consider whether it involves "newly discovered facts or circumstances or a change of law." (*Schachter v. Citigroup, Inc.* (2005) 126 Cal.App.4th 726, 739 [23 Cal.Rptr.3d 920]; see *Bagley v. TRW, Inc.* (1999) 73 Cal.App.4th 1092, 1097 [86 Cal.Rptr.2d 909] (*Bagley*) [second motion showed no new law and listed no new material facts in the separate statement].)

Although Patterson is correct that both motions for summary judgment involved "duty" in a *general* sense, the District's two motions were not identical and involved different legal theories. The first motion focused on whether there was a statutory basis for imposing a duty; the second motion focused on whether the common law defense of assumption of risk applied to negate any claim of duty. A comparison of the arguments and material facts shows that the District's second motion for summary judgment is not simply a "reformatted, condensed, and cosmetically repackaged" version of its first motion. (*Bagley*, *supra*, 73 Cal.App.4th at p. 1097.)

Moreover, we note that there was a change in the law following the court's September 15, 2005 ruling on the first summary judgment motion. On October 26, 2005, this court filed its opinion in *Saville v. Sierra College* (2005) 133 Cal.App.4th 857 [36 Cal.Rptr.3d 515] (*Saville*), which applied the doctrine of assumption of risk in the context of an adult education class at a public college. The District relied extensively on *Saville* in its second motion for summary judgment. For these reasons, we conclude that there was no procedural bar to the court's consideration of the District's second motion.

## III.

### *Duty of Care and Assumption of Risk*

Patterson's complaint alleges that the District "had a duty to supervise, train, educate, instruct, and oversee the conduct of its [truckdriver training] students" on proper techniques for loading and unloading flatbed trucks and trailers and "to exercise ordinary care to protect students from the type of injury" that Patterson suffered. The District maintains that under the doctrine of assumption of risk, it owed Patterson no duty of care.

■ Historically, the concept of duty developed in the late 19th century as a legal device was "designed to curtail the feared propensities of juries toward liberal awards." (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912].) The essential question in a duty analysis is " 'whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. . . . [Duty] is a shorthand statement of a conclusion, rather than an aid to analysis in itself. . . . But it should be recognized that "duty" is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' [Citation.]" (*Ibid.*; accord, *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 160–161 [41 Cal.Rptr.3d 299, 131 P.3d 383] (*Avila*).)

In deciding whether to depart from the general principle that a person is liable for injuries caused by his or her failure to exercise reasonable care, courts balance the now classic list of policy considerations which include "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561]; see *Stockinger v. Feather River Community College* (2003) 111 Cal.App.4th 1014, 1035 [4 Cal.Rptr.3d 385] (*Stockinger*).)

This case presents competing policy considerations. On one hand, as an adult student at a public school, is Patterson entitled to legal protection against the alleged negligence of the District employees in failing to supervise and instruct him on how to load wooden bleachers on a flatbed trailer? As we explained, the court denied the District's first summary judgment motion on grounds it owed Patterson a duty of care under statutory law. On

the other hand, does the doctrine of assumption of risk relieve the District of any duty of care based on the nature of the class activity and the potentially chilling effect of imposing a duty of care on the District's truck driving instructors? Although this case may not fit neatly into either line of authority, we conclude that Patterson was not engaged in an inherently dangerous activity as a matter of law. Nor do policy considerations favor application of the doctrine of assumption of risk. Accordingly, the court erred in ruling that assumption of risk barred Patterson's negligence claims.

### A. *The District Owed Patterson a Duty of Care:*

We begin by explaining more fully the legal basis for Patterson's claim of negligent supervision against the District. Public entities such as the District are not liable for injury arising from negligence except as provided by statute. (Gov. Code, § 815, subd. (a); *Stockinger, supra,* 111 Cal.App.4th at p. 1029.) Two statutes define the scope of negligence liability in the context of this case. Government Code section 815.2, subdivision (a) expressly provides: "A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative." Government Code section 820, subdivision (a) adds that, "a public employee is liable for injury caused by his act or omission to the same extent as a private person."

Public school districts enjoy certain immunities from actions for negligence. Relevant to this case is Education Code section 44808,[2] which reads: "Notwithstanding any other provision of this code, no school district, city or county board of education, county superintendent of schools, or any officer or employee of such district or board shall be responsible or in any way liable for the conduct or safety of any pupil of the public schools at any time when such pupil is not on school property, unless such district, board, or person has undertaken to provide transportation for such pupil to and from the school premises, has undertaken a school-sponsored activity off the premises of such school, has otherwise specifically assumed such responsibility or liability or has failed to exercise reasonable care under the circumstances. [¶] In the event of such a specific undertaking, the district, board, or person shall be liable or responsible for the conduct or safety of any pupil only while such pupil is or should be under the immediate and direct supervision of an employee of such district or board."

---

[2] From this point forward, undesignated statutory references are to the Education Code.

Section 44808 mirrors the immunity provisions in section 87706, the immunity statute applicable to community college districts.[3] Together, and with specific exceptions, sections 44808 and 87706 immunize school districts and community college districts from liability arising from the off-campus activities of students of any age. One or both statutes apply in this case because the District operated its truckdriver training course at the Charles A. Jones Skills and Business Education Center as an adult postsecondary educational and vocational school.

Under sections 44808 and 87706, an exception applies, a duty of care exists, and the school or community college district is subject to a student's negligence claim if (1) the district "has undertaken a school-sponsored activity off the premises of such school"; and (2) the student "is or should be under the immediate and direct supervision of an employee of such district or board." (§ 44808.) For purposes of sections 44808 and the identical section 87706, a " ' "school-sponsored activity" ' " is " 'one that requires attendance and for which attendance credit may be given . . . .' " (*Wolfe v. Dublin Unified School Dist.* (1997) 56 Cal.App.4th 126, 132 [65 Cal.Rptr.2d 280].) "[T]he test is not really whether the student's participation [is] voluntary or not, but whether the off-premises activity [is] part of the school curriculum." (*Barnhart v. Cabrillo Community College* (1999) 76 Cal.App.4th 818, 827 [90 Cal.Rptr.2d 709].)

Here, the evidence is undisputed that Patterson was required to participate in the community service project, which involved loading the wooden bleachers onto the flatbed trailer. The goal of the community service project was to teach students how to load the trailers safely. Based on this record, we conclude the off-campus community service project was a "school-sponsored activity" within the meaning of sections 44808 and 87706.

The second prong of the exception to the immunity provisions of sections 44808 and 87706 "draws a line between activities requiring additional supervision and control over the students when they travel, and the multitude of off-campus school-related activities for which liability cannot be imposed." (*Stockinger, supra,* 111 Cal.App.4th at p. 1031.) And while those statutes

---

[3] Section 87706 provides: "Notwithstanding any other provision of this code, no community college district, or any officer or employee of such district or board shall be responsible or in any way liable for the conduct or safety of any student of the public schools at any time when such student is not in [*sic*] school property, unless such district has undertaken to provide transportation for such student to and from the school premises, has undertaken a school-sponsored activity off the premises of such school, has otherwise specifically assumed such responsibility or liability or has failed to exercise reasonable care under the circumstances. [¶] In the event of such a specific undertaking, the district shall be liable or responsible for the conduct or safety of any student only while such student is or should be under the immediate and direct supervision of an employee of such district or board."

indicate that school personnel may have a duty to supervise public school students, "case law recognizes that the presumed maturity of college students warrants different treatment in terms of duty of supervision." (*Id.* at p. 1029.) We will assume that the same considerations apply to adult education students.

In *Crow v. State of California* (1990) 222 Cal.App.3d 192, 196–197 [271 Cal.Rptr. 349] (*Crow*), we rejected an adult college student's claim that the university was liable to him for negligently operating, maintaining and supervising the dormitory where he was beaten by a fellow student. In *Crow*, we specifically found that the plaintiff's affiliation with the university as a student "did not create a special relationship imposing a duty of care on [the university]. Unlike high school students, whose attendance is compelled and over whom school officials have direct responsibility while the students are at school, adult college students attend school and participate in school activities voluntarily." (*Ochoa v. California State University* (1999) 72 Cal.App.4th 1300, 1305 [85 Cal.Rptr.2d 768] (*Ochoa*), overruled in part on another ground in *Avila, supra*, 38 Cal.4th at p. 160, fn. 5, citing *Crow, supra*, 222 Cal.App.3d at pp. 208–209.) "Here, in contrast, plaintiff was an adult college student voluntarily participating in drinking beer at the dormitory." (*Crow, supra*, at p. 208.)

In *Ochoa*, we held that the university owed no duty to protect a student from criminal assault by an opposing player in an intramural soccer game under the circumstances of that case. (*Ochoa, supra*, 72 Cal.App.4th at p. 1305.) We expressly rejected the student's claim that the university created a special relationship and duty to supervise by organizing and sponsoring the intramural activity. (*Id.* at p. 1305.)

Finally, in *Stockinger*, we concluded that the section 87706 immunity applied to shield the public community college from liability for injuries the plaintiff suffered when she was thrown from the back of a pickup truck while traveling off campus on an assignment for a course on planning pack trips. The plaintiff rode unrestrained in the open bed of the truck knowing that it was dangerous to do so. (*Stockinger, supra*, 111 Cal.App.4th at pp. 1018–1020.) Although we assumed for purposes of the appeal that the assignment was a "school-sponsored activity," we applied the classic duty analysis and rejected the plaintiff's claim that she was or should have been "under the immediate and direct supervision of an employee of such district or board" for the off-campus assignment. (§ 87706; accord, *Stockinger, supra*, at pp. 1030, 1035–1036.) Specifically, we found that although it was arguable that the harm to the plaintiff was foreseeable, "the connection between defendants' alleged conduct (negligent failure to ensure safe travel) and plaintiff's harm was not particularly close, nor was defendants' conduct

morally blameworthy, given that (1) the students were college students training to assume leadership roles in pack trips, and (2) plaintiff admitted she did not need to be told by [the instructor] that her actions were dangerous. It is unclear how the policy of preventing future harm would be fostered by finding liability in this case. The extent of the burden on defendants, created by a requirement that it protect every college student from reckless driving by fellow students during performance of what amounts to homework assignments, would be extraordinary, as would be the likely increase in the college district's insurance premiums. [Citation.]" (*Stockinger, supra,* at pp. 1030, 1035–1036.)

Although *Crow, Ochoa* and *Stockinger* demonstrate that the school and community college districts did not owe a duty to supervise their adult students in the circumstances of those cases, they do not hold that school or community college districts never owe a duty of care to their adult students. (See also *Avila, supra,* 38 Cal.4th at p. 160, fn. 5 [disapproving *Ochoa* to the extent it suggests Gov. Code, § 831.7 "*always* immunizes universities against liability for injuries sustained by their adult student-athletes"].) Here, the instructors expressly and properly undertook supervision of the off-campus community service project. The classroom part of the District's truckdriver training course covered general principles of freight loading, but did not address the specifics of how to load flatbed trucks or trailers. The specific goal of the off-campus community service assignment was to teach students how to load the trailers safely. Consequently, the instructors typically critiqued the students after they loaded the cargo. Indeed, it appears to have been important to the success of the hands-on community service project that the instructors be present to share their experience and expertise with the students. The record clearly demonstrates that Patterson "[was] or should [have been] under the immediate and direct supervision of an employee of such district or board" within the meaning of sections 44808 and 87706. Accordingly, the District is not immune from suit for negligence.

The factors set forth in *Rowland v. Christian* support our conclusion that a duty of care should be imposed on the District in the circumstances of this case. (*Rowland v. Christian, supra,* 69 Cal.2d at p. 113.) The harm to Patterson was foreseeable given the size and weight of the wooden bleachers, the height of the flatbed trailer, and the teachers' presumption that the students lacked hands-on experience in loading flatbed trailers. It is undisputed that Patterson suffered injury when he fell backwards off the trailer during the loading of the bleachers onto the flatbed trailer. There was also a direct connection between the instructor's absence from the loading of the bleachers at the second location and the injury Patterson suffered. The community service project provided Patterson and the other students with hands-on experience on how to load the flatbed trailer safely. Although the loading of cargo involved "common sense," the instructors presumed that

students lacked prior experience. They routinely instructed and critiqued students at the loading site. While no moral blame attaches to the alleged negligence in this case, holding the District liable would help prevent future harm by ensuring that the instructors were on site to supervise the community service projects. Any increased burden of providing supervision for future community service projects was minimal because the instructors were already tasked with teaching the "hands-on" segment of the class and had already provided the students with some level of instruction, supervision and critique. Finally, we assume that the District already carries liability insurance and is in the best position to ensure against the risk created by lack of supervision in these circumstances.

The conclusion that the District owed Patterson a duty of care leaves a triable issue whether the District breached that duty of care. On the day of the incident, Allen was responsible for instructing Patterson and the other students on how to load the bleachers on the flatbed trailer. He was unaware of how much prior training or experience that Patterson and the other students had in loading trailers. Allen was present when the students picked up and easily loaded the aluminum bleachers at their first stop, but directed them to pick up the bleachers at the second stop on their own. Allen had not inspected the wooden bleachers before assigning the students to pick them up in his absence. Whether the District breached its duty of care is a question for the fact finder at trial.

### B. *Primary and Secondary Assumption of Risk:*

In *Knight*, the Supreme Court reconciled the doctrine of assumption of risk, which completely bars a plaintiff's recovery in a negligence action, with comparative negligence principles announced in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226] (*Li*). (*Knight v. Jewett, supra*, 3 Cal.4th at pp. 299–300 (*Knight*).) The discussion in *Knight* provides the necessary background for our decision that assumption of risk does not apply in this case. We quote *Knight* at length.

"In *Li*, our court undertook a basic reexamination of the common law doctrine of contributory negligence. As *Li* noted, contributory negligence generally has been defined as ' "conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and which is a legally contributing cause cooperating with the negligence of the defendant in bringing about the plaintiff's harm." ' (*Li, supra*, 13 Cal.3d at p. 809, quoting Rest.2d Torts, § 463.) Prior to *Li*, the common law rule was that ' "[e]xcept where the defendant has the last clear chance, the plaintiff's contributory negligence *bars recovery* against a defendant whose negligent

conduct would otherwise make him liable to the plaintiff for the harm sustained by him." ' (*Li, supra,* at pp. 809–810, italics added, quoting Rest.2d Torts, § 467.)

"In *Li, supra,* 13 Cal.3d 804, we observed that '[i]t is unnecessary for us to catalogue the enormous amount of critical comment that has been directed over the years against the "all-or-nothing" approach of the doctrine of contributory negligence. The essence of that criticism has been constant and clear: the doctrine is inequitable in its operation because it fails to distribute responsibility in proportion to fault . . . . *The basic objection to the doctrine—grounded in the primal concept that in a system in which liability is based on fault, the extent of fault should govern the extent of liability—remains irresistible to reason and all intelligent notions of fairness.*' (*Id.* at pp. 810–811, italics added.) After taking additional note of the untoward practical consequences of the doctrine in the litigation of cases and the increasing rejection of the doctrine in other jurisdictions, the *Li* court concluded that '[w]e are likewise persuaded that logic, practical experience, and fundamental justice counsel against the retention of the doctrine rendering contributory negligence a complete bar to recovery—and that it should be replaced in this state by a system under which liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault.' (*Id.* at pp. 812–813.)

"After determining that the 'all-or-nothing' contributory negligence doctrine should be replaced by a system of comparative negligence, the *Li* court went on to undertake a rather extensive discussion of the effect that the adoption of comparative negligence would have on a number of related tort doctrines, including the doctrines of last clear chance and assumption of risk. (*Li, supra,* 13 Cal.3d at pp. 823–826.) [¶] . . . [¶]

"With respect to the effect of the adoption of comparative negligence on the assumption of risk doctrine—the issue before [the *Knight* court]—the *Li* decision, *supra,* 13 Cal.3d 804, stated as follows: 'As for assumption of risk, we have recognized in this state that this defense overlaps that of contributory negligence to some extent and in fact is made up of at least two distinct defenses. "To simplify greatly, it has been observed . . . that in one kind of situation, to wit, where a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence, plaintiff's conduct, although he may encounter that risk in a prudent manner, is in reality a form of contributory negligence . . . . Other kinds of situations within the doctrine of assumption of risk are those, for example, where plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him. Such a situation would not involve contributory negligence, but rather a reduction of defendant's duty of care." [Citations.] We think it clear that the adoption of

a system of comparative negligence should entail the merger of the defense of assumption of risk into the general scheme of assessment of liability in proportion to fault in those particular cases in which the form of assumption of risk involved is no more than a variant of contributory negligence. [Citation.]' (*Li, supra*, 13 Cal.3d at pp. 824–825, original italics.)

"As this passage indicates, the *Li* decision, *supra*, 13 Cal.3d 804, clearly contemplated that the assumption of risk doctrine was to be *partially* merged or subsumed into the comparative negligence scheme. Subsequent Court of Appeal decisions have disagreed, however, in interpreting *Li*, as to what category of assumption of risk cases would be merged into the comparative negligence scheme.

"A number of appellate decisions, focusing on the language in *Li* indicating that assumption of risk is in reality a form of contributory negligence 'where a plaintiff *unreasonably* undertakes to encounter a specific known risk imposed by a defendant's negligence' (13 Cal.3d at p. 824), have concluded that *Li* properly should be interpreted as drawing a distinction between those assumption of risk cases in which a plaintiff 'unreasonably' encounters a known risk imposed by a defendant's negligence and those assumption of risk cases in which a plaintiff 'reasonably' encounters a known risk imposed by a defendant's negligence. (See, e.g., *Ordway* v. *Superior Court* [(1988)] 198 Cal.App.3d 98, 103–105 [243 Cal.Rptr. 536].) . . .

"In our view, these decisions—regardless whether they reached the correct result on the facts at issue—have misinterpreted *Li* by suggesting that our decision contemplated less favorable legal treatment for a plaintiff who reasonably encounters a known risk than for a plaintiff who unreasonably encounters such a risk. . . .

"Indeed, particularly when the relevant passage in *Li, supra*, 13 Cal.3d at pages 824–825, is read as a whole and in conjunction with the authorities it cites, we believe it becomes clear that the distinction in assumption of risk cases to which the *Li* court referred in this passage was not a distinction between instances in which a plaintiff unreasonably encounters a known risk imposed by a defendant's negligence and instances in which a plaintiff reasonably encounters such a risk. Rather, the distinction to which the *Li* court referred was between (1) those instances in which the assumption of risk doctrine embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk—the category of assumption of risk that the legal commentators generally refer to as 'primary assumption of risk'—and (2) those instances in which the defendant does owe a duty of care to the plaintiff but the plaintiff knowingly encounters a risk of injury caused by the defendant's breach of that duty—what most

commentators have termed 'secondary assumption of risk.' Properly interpreted, the relevant passage in *Li* provides that the category of assumption of risk cases that is not merged into the comparative negligence system and in which the plaintiff's recovery continues to be completely barred involves those cases in which the defendant's conduct did not breach a legal duty of care to the plaintiff, i.e., 'primary assumption of risk' cases, whereas cases involving 'secondary assumption of risk' properly are merged into the comprehensive comparative fault system adopted in *Li*.

"Although the difference between the 'primary assumption of risk'/'secondary assumption of risk' nomenclature and the 'reasonable implied assumption of risk'/'unreasonable implied assumption of risk' terminology embraced in many of the recent Court of Appeal decisions may appear at first blush to be only semantic, the significance extends beyond mere rhetoric. First, in 'primary assumption of risk' cases—where the defendant owes no duty to protect the plaintiff from a particular risk of harm—a plaintiff who has suffered such harm is not entitled to recover from the defendant, whether the plaintiff's conduct in undertaking the activity was reasonable *or unreasonable*. Second, in 'secondary assumption of risk' cases—involving instances in which the defendant has breached the duty of care owed to the plaintiff—the defendant is not entitled to be entirely relieved of liability for an injury proximately caused by such breach, simply because the plaintiff's conduct in encountering the risk of such an injury was *reasonable* rather than unreasonable. Third and finally, the question whether the defendant owed a legal duty to protect the plaintiff from a particular risk of harm does not turn on the reasonableness or unreasonableness of the plaintiff's conduct, but rather on the nature of the activity or sport in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity or sport. For these reasons, use of the 'reasonable implied assumption of risk'/'unreasonable implied assumption of risk' terminology, as a means of differentiating between the cases in which a plaintiff is barred from bringing an action and those in which he or she is not barred, is more misleading than helpful." (*Knight, supra*, 3 Cal.4th at pp. 304–309, fns. & some italics omitted.)

In our view, the case before us involves classic secondary assumption of risk—where the District owed a duty of care but, at most, Patterson may have unreasonably encountered the risk of climbing onto the flatbed truck to load the wooden bleachers. As we shall explain, the record and the policy reasons underlying primary assumption of risk demonstrate that the doctrine should not be applied in the circumstances of this case. Accordingly, Patterson's negligence claim survives the District's motion for summary judgment.

### C. *Assumption of Risk Does Not Trump the District's Duty:*

The Supreme Court observed in *Knight* that, "the phrase 'assumption of risk' traditionally has been used in a number of very different factual settings involving analytically distinct legal concepts." (*Knight, supra*, 3 Cal.4th at p. 303.) Two different species of assumption of risk are candidates for application in the case before us. One type of assumption of risk arose in the context of active sports and evolved to include similar activities in school and employment settings. The other type of assumption of risk, more commonly known as the firefighter's rule, arose and developed in the context of the public service professions. As we shall explain, neither species of assumption of risk applies here.

### 1. *The Firefighter's Rule:*

The firefighter's rule is a variation on the doctrine of primary assumption of risk based on different policy concerns than those found in the sports context. "In its most classic form, the firefighter's rule involves the question whether a person who negligently has started a fire is liable for an injury sustained by a firefighter who is summoned to fight the fire; the rule provides that the person who started the fire is not liable under such circumstances. [Citation.] Although a number of theories have been cited to support this conclusion, the most persuasive explanation is that the party who negligently started the fire had no legal duty to protect the firefighter from the very danger that the firefighter is employed to confront. [Citations.]" (*Knight, supra*, 3 Cal.4th at p. 309, fn. 5; see also, *Priebe v. Nelson* (2006) 39 Cal.4th 1112 [47 Cal.Rptr.3d 553, 140 P.3d 848] [employee of boarding kennel]; *Calatayud v. State of California* (1998) 18 Cal.4th 1057 [77 Cal.Rptr.2d 202, 959 P.2d 360] (*Calatayud*) [police officer].)

In *Calatayud*, the Supreme Court discussed the policies underlying the firefighter's rule. First, " ' "In terms of duty, it may be said there is none owed the fireman to exercise care so as not to require the special services for which he is trained and paid." ' [Citation.]" (*Calatayud, supra*, 18 Cal.4th at p. 1061.) Second, "[t]he rule is equally grounded in considerations of public policy ' "distilled from the relevant factors involved upon an inquiry into what is fair and just. . . . [¶] [I]t is the fireman's business to deal with that very hazard [the fire] and hence, perhaps by analogy to the contractor engaged as an expert to remedy dangerous situations, he cannot complain of negligence in the creation of the very occasion for his engagement." ' [Citations.] Moreover, 'public safety employees receive special public compensation for confronting the dangers posed by the defendants' negligence.' [Citation.] 'Firemen and policemen are paid for the work they perform including preparation for facing the hazards of their professions and dealing

with perils when they arise. When injury occurs, liberal compensation is provided. In addition to the usual medical and disability benefits ordinarily provided all employees covered by the Workers' Compensation Act, firemen and policemen are provided special benefits [including special statutory presumptions of industrial causation, special death benefits, optional paid leaves of absence, and fully paid disability benefits despite retirement].' [Citations.]" (*Id.* at pp. 1061–1062.)

None of the policy reasons undergirding the firefighter's rule applies to a student like Patterson who attends adult education courses offered by a public school district. The student receives no advance training to deal with the danger; rather, he is attending the adult education class to obtain that training. The student receives no compensation in the form of wages; instead, he ordinarily pays fees to the district in order to participate in its educational program. Finally, the adult education student receives no special public benefits when he is injured. (See, e.g., *Land v. Workers' Comp. Appeals Bd.* (2002) 102 Cal.App.4th 491 [125 Cal.Rptr.2d 432] [university student injured during the field experience portion of a class in animal husbandry not entitled to workers' compensation benefits].) Because none of the policy reasons advanced for the firefighter's rule applies in the circumstances of the present case, we conclude the rule is inapplicable.

### 2. *Assumption of Risk in the Sports Context:*

The *Knight* court described primary assumption of risk as an exception to the general rule that people "have a duty to use due care to avoid injury to others, and may be held liable if their careless conduct injures another person." (*Knight, supra,* 3 Cal.4th at p. 315.) As we explained earlier, the doctrine applies "where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury . . . ." (*Id.* at pp. 314–315.) *Knight* instructs that where "the careless conduct of others is treated as an 'inherent risk' of a sport" or activity, recovery is barred. (*Id.* at p. 316.)

The classic assumption of risk cases arose in the active sports context where California courts ruled that the doctrine barred participants from suing coparticipants or coaches for their injuries. (See, e.g., *Avila, supra,* 38 Cal.4th 148 [student baseball game]; *Cheong v. Antablin* (1997) 16 Cal.4th 1063 [68 Cal.Rptr.2d 859, 946 P.2d 817] [skier]; *Knight, supra,* 3 Cal.4th 296 [touch football game]; *Fortier v. Los Rios Community College Dist.* (1996) 45 Cal.App.4th 430 [52 Cal.Rptr.2d 812] [football practice]; *Regents of University of California v. Superior Court* (1996) 41 Cal.App.4th 1040 [48 Cal.Rptr.2d 922] [rock climbing class]; *Galardi v. Seahorse Riding Club*

(1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270] [horse jumping instruction]; *Tan v. Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89] [jockey school]; cf. *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990 [4 Cal.Rptr.3d 103, 75 P.3d 30] [primary assumption of risk applied to novice swimmer, but summary judgment reversed because the record established reckless conduct by the coach as a matter of law].)

*Knight* articulated the policy basis for applying the assumption of risk doctrine in the active sports setting. "In reaching the conclusion that a coparticipant's duty of care should be limited in this fashion, the cases have explained that, in the heat of an active sporting event like baseball or football, a participant's normal energetic conduct often includes accidentally careless behavior. The courts have concluded that vigorous participation in such sporting events likely would be chilled if legal liability were to be imposed on a participant on the basis of his or her ordinary careless conduct. The cases have recognized that, in such a sport, even when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (*Knight, supra,* 3 Cal.4th at pp. 318–319.)

If the assumption of risk doctrine were limited to the sports context, there would be little question that it is inapplicable in the circumstances of the present case. However, by expanding application of the doctrine to school and employment settings, California courts have provided the District with a rationale to justify its argument that assumption of risk bars Patterson's negligence claim here. As we explain, the policy basis for applying the doctrine is still lacking.

### 3. *Assumption of Risk in Other Contexts:*

California courts have expanded the scope of the assumption of risk doctrine to encompass dangerous activities in other contexts where the activity is inherently dangerous. (See, e.g., *Saville, supra,* 133 Cal.App.4th 857 [training in peace officer takedown maneuvers]; *Hamilton v. Martinelli & Associates* (2003) 110 Cal.App.4th 1012 [2 Cal.Rptr.3d 168] (*Hamilton*) [training on physical restraint methods]; *Aaris v. Las Virgenes Unified School Dist.* (1998) 64 Cal.App.4th 1112 [75 Cal.Rptr.2d 801] (*Aaris*) [cheerleader practice]; *Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525 [50 Cal.Rptr.2d 671] [practice of moves in judo class].) Two of these cases deserve special mention.

The first is *Hamilton*. In that case, the plaintiff worked as a probation corrections officer (and peace officer) in a youth detention center. Her duties included supervising and counseling children between the ages of 10 and 18, including violent offenders. The plaintiff participated in an "Unarmed Defensive Tactics" training course taught by defendant Martinelli & Associates. She injured her neck and back when she performed a "maneuver . . . designed to teach [her how] to extricate herself if she was attacked, landed on her stomach, and was being choked by an assailant straddling her back." (*Hamilton, supra*, 110 Cal.App.4th at p. 1018.) In holding that the doctrine of primary assumption of risk applied, the court found that the injuries the plaintiff suffered in a training course for probation corrections officers were an inherent risk of performing the training maneuver. (*Id.* at pp. 1017–1018, 1023.) "Moreover, plaintiff's employment duties entailed the very risk of injury of which she complains. [¶] Plaintiff's employment duties included restraining violent juvenile offenders. She was required to wear a uniform and carry pepper spray. And since 1997, her job philosophy emphasized physical restraint of juveniles. Thus, the ability to physically restrain juveniles was a necessary tool in plaintiff's employment. By continuing in this employment capacity, plaintiff assumed the risk that she would be injured by a violent juvenile offender. And by participating in an employer-required training course, she assumed the risk that she would be injured while training to restrain a violent juvenile offender." (*Id.* at p. 1023.)

Unlike the activity described in *Hamilton*, which satisfied one requirement for applying assumption of risk, loading a flatbed trailer is not an inherently dangerous activity. We reject the District's suggestion, based on language in *Aaris, supra*, 64 Cal.App.4th at p. 1114, that "[w]henever gravity is at play . . . , the risk of injury is inherent." This case involves standing on the bed of the trailer, albeit five feet above the ground. Gravity is similarly "at play" when a person climbs up a ladder, walks across a bridge or leans against a porch railing. The District cites no case that holds assumption of risk applies to such common, everyday work activities. We conclude that loading wooden bleachers on a flatbed trailer is not inherently dangerous as a matter of law.

Moreover, the court's rationale in *Hamilton* is really a mixture of the firefighter's rule and assumption of risk based on competitive or violent sports announced in *Knight*. Because the plaintiff incurred the injury in connection with her employment, all the policy reasons supporting application of the firefighter's rule would apply, including the provision of care and treatment under the workers' compensation scheme. In the case before us, Patterson was not an employee who would be covered by workers' compensation or (so far as the record shows) by any other insurance. Patterson, a

student, simply signed up for a truckdriver training class. We conclude that the policy reasons for applying primary assumption of risk in *Hamilton* are completely absent here.

The second case deserving special mention is *Saville, supra,* 133 Cal.App.4th 857, an opinion from this court. The plaintiff in *Saville* enrolled in a certified peace officer training class offered by the defendant community college. The course consisted of three parts: lectures, arrest and control methods, and firearms. Students were required to attend and pass all three parts of the course. (*Id.* at p. 861.) They learned arrest and control methods from the local police chief "in as realistic an experience as possible . . . [by] 'modeling' the actions an actual police officer would take when performing a takedown in the field." (*Id.* at p. 862.) Three police officers demonstrated four takedown maneuvers. (*Id.* at pp. 862–863.) The officers then moved around the room to observe the students as they practiced the maneuvers. The plaintiff injured his back while practicing what was described as a forehead sweep. (*Id.* at p. 863.) This court concluded that the takedown maneuvers bore "similar risks of injury inherent in many sports. The maneuvers are inherently dangerous. One person is intentionally throwing another to the ground. 'Whenever gravity is at play with the human body, the risk of injury is inherent.' " (*Id.* at p. 867, quoting *Aaris, supra,* 64 Cal.App.4th at p. 1114.) "Careless conduct by others is also an inherent risk in performing the maneuvers. Plaintiff acknowledged both he and his partner were inexperienced and had not learned or practiced these maneuvers before the class. Even with the steps taken by the officers to minimize the risk of injury— personal training, placing mats on the floors, demonstrating the moves, observing the students perform the moves—the risk of harm from participating in the actual maneuvers with an inexperienced person remained obvious, and plaintiff suffered injury from that particular risk. Grabbing someone's face from behind, pushing his head into his spine, and throwing him back and down to the ground with an elbow in his back, even at half speed, could hurt someone." (*Saville, supra,* at p. 867.)

■ Once again, there is a vast difference between the activity described as inherently dangerous in *Saville* and the activity at issue in the present case. Driving a truck, or even loading a truck, does not involve the same risk of injury as the violent takedown maneuver at issue in that case. Inherent danger is measured by more than the number or inches or feet between the plaintiff and the ground. (Cf. *Aaris, supra,* 64 Cal.App.4th at p. 1114.)

We also concluded in *Saville* that "[i]mposing a duty to eliminate the risk of injury from the activity in [that] particular classroom situation would invariably chill vigorous participation in learning the maneuvers." (*Saville, supra,* 133 Cal.App.4th at p. 867.) What the instructors allegedly did—or did

not do—in the present case is conduct that we want to chill. As a matter of policy, we do not want truckdriver training instructors to send inexperienced students out to load flatbed trailers without instruction and supervision.

■ In deciding that primary assumption of risk does not apply in the case before us, we cite *Knight* one last time: "It may be helpful at this point to summarize our general conclusions as to the current state of the doctrine of assumption of risk in light of the adoption of comparative fault principles in *Li, supra,* 13 Cal.3d 804, general conclusions that reflect the view of a majority of the justices of the court (i.e., the three justices who have signed this opinion and Justice Mosk (see conc. and dis. opn. by Mosk, J., *post,* p. 321)). In cases involving 'primary assumption of risk'—where, by virtue of the nature of the activity and the parties' relationship to the activity, the defendant owes no legal duty to protect the plaintiff from the particular risk of harm that caused the injury—the doctrine continues to operate as a complete bar to the plaintiff's recovery. In cases involving 'secondary assumption of risk'—where the defendant does owe a duty of care to the plaintiff, but the plaintiff proceeds to encounter a known risk imposed by the defendant's breach of duty—the doctrine is merged into the comparative fault scheme, and the trier of fact, in apportioning the loss resulting from the injury, may consider the relative responsibility of the parties." (*Knight, supra,* 3 Cal.4th at pp. 314–315, fn. omitted.)

■ The wise and just rule to be applied in this case is one that imposes a duty of reasonable care upon the District to Patterson and apportions responsibility for damages between the District and Patterson according to their respective degrees of fault. Given the nature of the instructors' alleged breach of duty in this case, there is no reason in law, equity or policy to absolve the District entirely from liability for damages suffered by Patterson. Although it might be argued that the District will decline to provide truck driving classes in the future, that argument is speculative and therefore untenable on this record. (See *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 773–776 [62 Cal.Rptr.3d 527, 161 P.3d 1095].) For all these reasons, we conclude the court erred in finding that the doctrine of assumption of risk applied.

Given this resolution of the case, we need not address Patterson's argument that even if primary assumption of risk applied in this case, the undisputed evidence suggests that the District's conduct recklessly increased the risks inherent in loading the flatbed trailer.

## DISPOSITION

The judgment is reversed. Patterson shall recover his costs on appeal. (Cal. Rules of Court, rule 8.276(a)(1).)

Sims, Acting P. J., and Raye, J., concurred.

A petition for a rehearing was denied October 22, 2007, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied December 12, 2007, S157928.