Filed 11/27/18; Certified for Publication 12/19/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| UNIVERSITY OF SOUTHERN CALIFORNIA, | B288180 |
| Petitioner, | (Los Angeles County Super. Ct. No. BC597033) |
| v. | |
| SUPERIOR COURT OF COUNTY OF LOS ANGELES, | |
| Respondent; | |
| CARSON BARENBORG, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate. Ruth Ann Kwan, Judge. Petition granted.

Hill, Farrer & Burrill, Dean E. Dennis and Jenner C. Tseng for Petitioner.

No appearance for Respondent.

Law Office of Martin N. Buchanan, Martin N. Buchanan; Girardi | Keese and Amanda McClintock for Real Party in Interest.

_____

Carson Barenborg was dancing on a makeshift raised platform at a fraternity party near the University of Southern California (USC) when another partygoer bumped into her, causing her to fall to the ground and suffer serious injuries. Barenborg, who was not a USC student, sued USC and others for negligence, alleging that the university had a duty to protect her from an unreasonable risk of harm and breached that duty by failing to prevent or shut down the party. The trial court denied USC's motion for summary judgment. USC filed a petition for a peremptory writ of mandate challenging the denial.

USC contends that it had no duty to protect members of the public from the conduct of a third party at an off-campus fraternity party. We agree and grant the petition.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Incident*

Several fraternities and sororities affiliated with USC occupy houses in an area near the USC campus known as Greek Row, including a chapter of Sigma Alpha Epsilon Fraternity.[1] On

_____

[1]     Sigma Alpha Epsilon Fraternity is a nonprofit corporation and a national fraternal organization. We will use the term SAE

2

October 10, 2013, the day of a home football game, several fraternities, including Cal. Gamma, held parties on Greek Row where alcohol was served. The street was crowded with partygoers.

USC's Policy on Alcohol and Other Drugs required fraternities and sororities to obtain prior authorization to serve alcohol at social events. USC's Social Events Policy prohibited parties after 10 p.m. on evenings preceding school days, and allowed parties only between Fridays at 3:00 p.m. and Sundays at 5:00 p.m. Cal. Gamma's party on Thursday, October 10, 2013, was unauthorized and violated both of these policies. USC was aware of prior violations of university policy and other misconduct at Cal. Gamma, some involving the use of alcohol, and had recently issued warnings and imposed discipline on the fraternity.

USC's Department of Public Safety (DPS) employed safety officers who patrolled the USC campus and Greek Row. On October 10, 2013, before Barenborg's injury, two DPS officers visited Cal. Gamma several times in response to complaints of loud music and public drinking. On each visit, they saw an abundance of alcohol on the property. They asked the person in charge at Cal. Gamma to turn down the music and reminded him that public drinking was not allowed, but they did not shut down the party. The two officers were not aware of USC's policy prohibiting parties on Thursdays and generally were untrained

---

to refer to the national organization. SAE's local USC chapter was California Gamma Chapter (Cal. Gamma). California Gamma Building Association, a separate legal entity, owned the Cal. Gamma fraternity house.

in the enforcement of USC's policies governing alcohol use and social events.

Barenborg was a 19-year-old student at Loyola Marymount University at the time of her injury. On October 10, 2013, she visited parties on Greek Row with a group of friends. Barenborg consumed cocaine and five to seven alcoholic beverages before arriving at Cal. Gamma, and she continued drinking alcohol after she arrived there.

The Cal. Gamma party was in the backyard of the fraternity house on and around a basketball court. There were approximately 200 to 250 people at the party. A platform approximately seven feet tall constructed from tables was being used for dancing.

Barenborg and two female friends were stepping up onto the platform where USC student Hollis Barth and another woman were dancing when Barth gave them an unwelcoming look. Just as Barenborg and one of her friends reached the top of the platform, Barth bumped Barenborg and her friend off the platform, they fell to the ground, and Barenborg sustained serious injuries.[2]

2. *The Complaint*

Barenborg's second amended complaint filed in September 2016 alleges a single cause of action for negligence against USC, SAE, and Barth.[3] Barenborg alleges that USC's failure to enforce both its own policies and state and local drinking laws resulted in increased alcohol-related injuries at fraternity parties. She

---

[2]    No criminal charges were brought against Barth.

[3]    Barenborg later added California Gamma Building Association as a defendant.

alleges that USC owed members of the public a duty of care to avoid exposing them to an unreasonable risk of harm, and breached that duty by failing to shut down the party on October 10, 2013.

3. *The Summary Judgment Motion*

USC moved for summary judgment, arguing that it had no duty to protect members of the public from third party conduct and had no special relationship with Barenborg giving rise to a duty of care. USC also argued that it never voluntarily assumed a duty to protect Barenborg and therefore could not be held liable under the negligent undertaking doctrine, among other arguments.[4]

Barenborg argued in opposition that USC owed her a duty of care because (1) USC had a special relationship with its students and their invitees; (2) USC voluntarily assumed a duty to supervise behavior on and around campus, including at fraternity houses on Greek Row, USC increased the risk of harm by failing to shut down the Cal. Gamma party, and Barenborg relied on USC to ensure a safe environment; and (3) USC had the right to control the Cal. Gamma property and therefore owed a duty of care to Barenborg as a social invitee under principles of premises liability.

The trial court heard USC's summary judgment motion in November 2017. On January 11, 2018, the court filed a 16-page order denying the motion. The trial court summarized its ruling:

---

[4] SAE and California Gamma Building Association successfully moved for summary judgment. Barenborg's appeal from the judgments in favor of SAE and California Gamma Building Association is currently pending in this court (case No. B289766).

5

"The Court cannot determine that, as a matter of law, Defendant did not owe Plaintiff a duty of care. There are triable issues of material fact as to the existence of a special relationship between Defendant and Plaintiff. Specifically, evidence before the Court suggests Defendant was aware that alcohol abuse in the Greek System, including SAE, was a problem that caused accidents and injuries, Defendant asserted control over SAE and/or SAE's ability to have events, Defendant voluntarily assumed a protective duty to Plaintiff by having DPS officers patrol and enforce the policies, and Plaintiff relied on Defendant/DPS to provide her with a safe environment."

4.    *The Petition for Writ of Mandate*

On February 15, 2018, USC filed a petition for a peremptory writ of mandate pursuant to Code of Civil Procedure section 437c, subdivision (m)(1), challenging the denial of its summary judgment motion.[5] We issued an order to show cause. We specifically directed the parties to address, in addition to any other arguments, the California Supreme Court's analysis in *Regents of the University of California v. Superior Court* (2018) 4 Cal.5th 607 (*Regents*) regarding a college's limited duty to protect its students from foreseeable harm, and whether that analysis applies in the present case.[6]

---

[5]    The parties stipulated to extend the time to file a writ petition by 10 days, and the trial court so ordered.

[6]    Writ relief is extraordinary because an aggrieved party usually has an adequate remedy by filing a postjudgment appeal. A writ of mandate may be appropriate, however, if the erroneous denial of a summary judgment motion would result in a trial on nonactionable claims. (*Pacific Gas and Electric Co. v. Superior*

6

**STANDARD OF REVIEW**

"'On review of an order granting or denying summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion. [Citation.]

"Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' [Citation.] A defendant seeking summary judgment must show that the plaintiff cannot establish at least one element of the cause of action. [Citation.] . . . 'Duty, being a question of law, is particularly amenable to resolution by summary judgment.' [Citation.]" (*Regents*, *supra*, 4 Cal.5th at p. 618.)

**DISCUSSION**

1. *The Duty of Care and Third Party Conduct*

A duty of care is an essential element of a negligence cause of action. (*Regents*, *supra*, 4 Cal.5th at p. 618.) "The determination whether a particular relationship supports a duty of care rests on policy and is a question of law. [Citation.]" (*Id.* at p. 620.)

---

*Court* (2018) 24 Cal.App.5th 1150, 1157; *Local TV, LLC v. Superior Court* (2016) 3 Cal.App.5th 1, 7.)

7

"'A judicial conclusion that a duty is present or absent is merely "'a shorthand statement . . . rather than an aid to analysis. . . . "[D]uty," is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection."'" [Citation.] "Courts, however, have invoked the concept of duty to limit generally 'the otherwise potentially infinite liability which would follow from every negligent act. . . .'" [Citation.]" (*Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 573.)

As a general rule, each person has a duty to exercise reasonable care to avoid causing injury to others. (Civ. Code, § 1714, subd. (a); *Regents*, *supra*, 4 Cal.5th at p. 619; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).) However, a person who has not created a peril generally has no duty to take affirmative action to protect against it, and a person generally has no duty to protect another from the conduct of third parties. (*Regents*, at p. 619 ["'A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act"]; *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235 (*Delgado*) ["as a general matter, there is no duty to act to protect others from the conduct of third parties"]; *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1129 (*Zelig*) ["'[a]s a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct'"].)

Courts have recognized exceptions to the general rule of no duty with respect to third party conduct where a "special relationship" exists and where the defendant engages in a

8

"negligent undertaking." (*Regents*, *supra*, 4 Cal.5th at pp. 619–620; *Delgado*, *supra*, 36 Cal.4th at p. 249.)

A defendant may owe a duty to protect the plaintiff from third party conduct if the defendant has a special relationship with either the plaintiff or the third party. (*Regents*, *supra*, 4 Cal.5th at pp. 619–620; *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 435 (*Tarasoff*); Rest.3d Torts, Liability for Physical and Emotional Harm, §§ 40, 41.) A related but separate basis for such a duty is where the defendant voluntarily undertakes to provide protective services for the plaintiff's benefit, and either (a) the defendant's failure to exercise reasonable care increases the risk of harm to the plaintiff, or (b) the plaintiff reasonably relies on the undertaking and suffers injury as a result. (*Delgado*, *supra*, 36 Cal.4th at pp. 248–249; *Williams v. State of California* (1983) 34 Cal.3d 18, 23 (*Williams*); Rest.3d Torts, *supra*, § 42.)

2.    <u>Regents</u> *Clarifies the Boundaries of a University's Duty of Care*[7]

In *Regents*, *supra*, 4 Cal.5th 607, a college student with a known history of mental illness, who had admitted to a university psychologist that he was thinking of harming others, stabbed another student in a chemistry laboratory on campus. The victim sued the university and several of its employees for negligence. (*Id*. at pp. 613–615.) The California Supreme Court stated, "In general, each person has a duty to act with reasonable care under the circumstances. [Citations.] However, 'one owes no duty to control the conduct of another, nor to warn those

---

[7]    Neither the trial court nor the parties had the benefit of *Regents*' guidance at the time of the summary judgment motion hearing.

9

endangered by such conduct.' [Citation.] 'A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act.' [Citation.]" (*Id*. at p. 619.)

*Regents* first considered whether a university has a special relationship with its students supporting a duty to warn or protect them from foreseeable harm. (*Regents*, *supra*, 4 Cal.5th at p. 620.) The court explained that special relationships typically are characterized by the plaintiff's dependence on the defendant for protection and the defendant's superior control over the means of protection. (*Id*. at pp. 620–621.) Special relationships also are limited to specific individuals, rather than the public at large. (*Id*. at p. 621.) "Finally, although relationships often have advantages for both participants, many special relationships especially benefit the party charged with a duty of care. [Citation.] Retail stores or hotels could not successfully operate, for example, without visits from their customers and guests." (*Ibid*.)

*Regents* explained that shifting cultural attitudes have changed the legal significance of the college-student relationship. Colleges once were regarded as standing in loco parentis to students, resulting in both an obligation to protect students and some degree of immunity from suit by students. Later, when social changes led to greater privacy and autonomy rights for adult students, courts generally treated colleges as "bystanders" with a limited duty to students arising from a business relationship, but no broader duty based on a special relationship. (*Regents*, *supra*, 4 Cal.5th at p. 622.) "While the university might owe a duty as a landowner to maintain a safe premises, courts

10

typically resisted finding a broader duty based on a special relationship with students.  [Citation.]  This was particularly so when injuries resulted from alcohol consumption or fraternity activity.  [Citation.]"  (*Ibid.*)

*Regents* discussed three Court of Appeal opinions from the "bystander" era.  (*Regents*, *supra*, 4 Cal.5th at pp. 622–624.)  In *Baldwin v. Zoradi* (1981) 123 Cal.App.3d 275 (*Baldwin*), a college student was injured in an off-campus drag race after the drivers, who were also students, drank alcohol in dormitories on campus despite the university's prohibition against alcohol on campus.  (*Id.* at p. 279.)  *Baldwin* stated that the former in loco parentis role of college administrators had yielded to students' greater independence.  (*Id.* at p. 287.)  *Regents* stated, "Distinguishing special relationships in other contexts, the [*Baldwin*] court concluded the university lacked sufficient control over student behavior to justify imposing a duty to prevent on-campus drinking.  [Citation.]"  (*Regents*, *supra*, 4 Cal.5th at p. 623.)

In *Crow v. State of California* (1990) 222 Cal.App.3d 192 (*Crow*), a college student was injured when another student attacked him at a dormitory "keg party."  (*Id.* at p. 197.)  *Crow* largely followed the reasoning in *Baldwin*, *supra*, 123 Cal.App.3d 275, stating, "Given these realities of modern college life, the university does not undertake a duty of care to safeguard its student from the risks of harm flowing from the use of alcoholic beverages."  (*Crow*, at p. 209.)

In *Tanja H. v. Regents of University of California* (1991) 228 Cal.App.3d 434 (*Tanja H.*), a college student was raped by other students in a dormitory on campus after a party with alcohol.  (*Id.* at p. 436.)  Citing *Baldwin*, *supra*, 123 Cal.App.3d 275, and *Crow*, *supra*, 222 Cal.App.3d 192, *Tanja H.* stated that a

11

duty to prevent alcohol-related crimes would require universities to "impose onerous conditions on the freedom and privacy of resident students—which restrictions are incompatible with a recognition that students are now generally responsible for their own actions and welfare[.]" (*Tanja H.*, at p. 438.)

*Regents* stated, "*When the particular problem of alcohol-related injuries is not involved*, our cases have taken a somewhat broader view of a university's duties toward its students." (*Regents*, *supra*, 4 Cal.5th at p. 623; italics added.) *Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799 (*Peterson*) held that a community college district owed a duty to warn its students of known dangers posed by criminals on campus. The duty was based on the district's status as a landowner. (*Id.* at pp. 808–809; see *Regents*, at p. 624.) *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148 held that a community college district hosting an intramural sports competition owed a duty to participating students not to increase the risks inherent in the sport. (*Id.* at p. 162; see *Regents*, at p. 624.) *C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, involving a guidance counselor's sexual harassment of a high school student, held that a school district had a special relationship with its students arising from mandatory attendance and the district's "comprehensive control over students," and that the district owed a duty of care to protect students from foreseeable injury by third parties acting negligently or intentionally. (*Id.* at pp. 869–870; see *Regents*, at p. 624.)

*Regents* concluded that postsecondary schools have a special relationship with their students "while they are engaged in activities that are part of the school's curriculum or closely

12

related to its delivery of educational services."[8] (*Regents*, *supra*, 4 Cal.5th at pp. 624–625.) Students depend on their college to provide structure, guidance, and a safe learning environment. Meanwhile, the college has superior control over the campus environment, imposes rules and restrictions, employs resident advisors, mental health counselors, and campus police, can monitor and discipline students, and, more broadly, has the power to influence students' values and behavior. (*Id*. at p. 625.) *Regents* stated, "The special relationship we now recognize . . . extends to activities that are tied to the school's curriculum but not to student behavior over which the university has no significant degree of control." (*Id*. at p. 627.)

*Regents* noted the limits of such a special relationship, stating: "Of course, many aspects of a modern college student's life are, quite properly, beyond the institution's control. Colleges generally have little say in how students behave off campus, or in their social activities unrelated to school. It would be unrealistic for students to rely on their college for protection in these settings, and the college would often be unable to provide it. This is another appropriate boundary of the college-student relationship: Colleges are in a special relationship with their enrolled students only in the context of school-sponsored activities over which the college has some measure of control." (*Regents*, *supra*, 4 Cal.5th at p. 626.)

*Regents* concluded that as a result of the special relationship, colleges owe a duty to exercise reasonable care to

---

[8]  For purposes of its discussion, *Regents* did not distinguish undergraduate from postgraduate students and used the terms "college" and "university" interchangeably. (*Regents*, *supra*, 4 Cal.5th at p. 613, fn. 1.)

protect students from foreseeable acts of violence in the classroom and during curricular activities. (*Regents*, *supra*, 4 Cal.5th at p. 627.) Considering the *Rowland* factors (*Rowland v. Christian* (1968) 69 Cal.2d 108), *Regents* further concluded that violence in the classroom was sufficiently foreseeable, there was a close connection between the university's alleged negligence and the plaintiff's injury, and public policy considerations did not justify precluding liability. (*Regents*, at pp. 628–634.)

*Regents* disapproved *Baldwin*, *supra*, 123 Cal.App.3d 275, *Crow*, *supra*, 222 Cal.App.3d 192, *Tanja H.*, *supra*, 228 Cal.App.3d 434, *Ochoa v. California State University* (1999) 72 Cal.App.4th 1300 (*Ochoa*), and *Stockinger v. Feather River Community College* (2003) 111 Cal.App.4th 1014 (*Stockinger*), but only "[t]o the extent they are inconsistent with our holdings regarding the special relationship between colleges and students, or colleges' duty of care . . . ."[9] (*Regents*, *supra*, 4 Cal.5th at p. 634, fn. 7.)

3.      USC Did Not Have a Special Relationship with Barenborg

A defendant may have an affirmative duty to protect the plaintiff from the conduct of a third party if the defendant has a special relationship with the plaintiff. (*Regents*, *supra*, 4 Cal.5th at p. 619; *Delgado*, *supra*, 36 Cal.4th at p. 235.) Examples of

---

[9]      *Ochoa* held that a university had no special relationship with an adult student and no duty to protect the student from the criminal act of another student during an intramural soccer game. (*Ochoa*, *supra*, 72 Cal.App.4th at pp. 1305–1306.) *Stockinger* held that a community college owed no duty of care to an adult student participating in a school-sponsored, off campus activity. (*Stockinger*, *supra*, 111 Cal.App.4th at pp. 1031–1036.)

14

such a relationship include the relationships between common carriers and their passengers, innkeepers and their guests, business proprietors and their invitees, landlords and their tenants, and colleges and students engaged in curricular activities. (*Regents*, at p. 620; *Delgado*, at pp. 235–236.)

Unlike the plaintiff in *Regents*, *supra*, 4 Cal.5th 607, Barenborg was not a student attending the defendant university at the time of her injury, and she was not engaged in an activity closely related to the delivery of educational services. However, she contends that USC had a special relationship with her based not on her status as a student, but on her status as an invitee at premises subject to USC's control.

The relationship between a possessor of land and an invitee is a special relationship giving rise to a duty of care. (*Peterson*, *supra*, 36 Cal.3d at p. 806 [a special relationship exists between "a possessor of land and members of the public who enter in response to the landowner's invitation"].) A person who possesses or controls land has a duty to exercise reasonable care to maintain the land in a reasonably safe condition. (*Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1156 (*Alcaraz*); *Staats v. Vintner's Golf Club, LLC* (2018) 25 Cal.App.5th 826, 833.) "A defendant need not own, possess *and* control property in order to be held liable; control alone is sufficient." (*Alcaraz*, at p. 1162; see *Johnston v. De La Guerra Properties, Inc.* (1946) 28 Cal.2d 394, 401 [tenant owed a duty of care on property outside of the leased premises based on tenant's exercise of control].) The duty of care includes a duty to take reasonable steps to protect persons on the property from physical harm caused by the foreseeable conduct of third parties. (*Peterson*, at 807; see *Delgado*, *supra*, 36 Cal.4th at

15

p. 244 [business proprietor has a duty to take reasonable steps to protect against foreseeable criminal acts of third parties].)

Barenborg argues that USC had a special relationship with her based on its control of the property because the fraternity house was subject to USC's policies and was monitored by its public safety officers. She cites *Alcaraz*, *supra*, 14 Cal.4th 1149, and *Southland Corp. v. Superior Court* (1988) 203 Cal.App.3d 656 (*Southland*) in support of her argument. Neither is apposite.

In *Alcaraz*, the plaintiff was injured when he stepped into a water meter box near his rental unit. (*Alcaraz*, *supra*, 14 Cal.4th at p. 1152.) The meter box was located on a strip of land owned by the city between the sidewalk and the defendants' property line. (*Ibid*.) *Alcaraz* stated that a defendant's duty to maintain land in a reasonably safe condition extends to land over which the defendant exercises control, regardless of who owns the land. (*Id*. at pp. 1158–1159.) "As long as the defendant exercised control over the land, the location of the property line would not affect the defendant's potential liability." (*Id*. at p. 1161.) Evidence that the defendant maintained the lawn surrounding the meter box and, after the plaintiff's injury, constructed a fence enclosing the entire lawn, including the meter box, created a triable issue of fact as to whether the defendants exercised control over the land where the plaintiff was injured, precluding summary judgment.[10] (*Id*. at pp. 1161–1162, 1167.)

---

[10] *Alcaraz* cautioned, "This is not to say that the simple act of mowing a lawn on adjacent property (or otherwise performing minimal, neighborly maintenance of property owned by another) generally will, standing alone, constitute an exercise of control over property and give rise to a duty to protect or warn persons entering the property." (*Alcaraz*, *supra*, 14 Cal.4th at p. 1167;

*Southland*, *supra*, 203 Cal.App.3d 656, involved an assault on a convenience store customer in a vacant lot adjacent to the store property. The defendant store owners did not own or lease the vacant lot, but their customers often parked there, their lease authorized their nonexclusive use of the lot for customer parking, and store employees previously had taken action to remove loiterers from both the store property and the adjacent lot. (*Id*. at pp. 666–667.) *Southland* stated that a defendant may have a duty to protect a plaintiff from the conduct of third parties on property the defendant owns, possesses, or controls. (*Id*. at p. 664.) The evidence created a triable issue of fact as to whether the defendant exercised control over the adjacent lot, precluding summary judgment.[11] (*Id*. at pp. 666–667.)

---

see *Contreras v. Anderson* (1997) 59 Cal.App.4th 188, 198 ["simple maintenance of an adjoining strip of land owned by another does not constitute an exercise of control over that property"].)

[11] Barenborg cites *Southland*, *supra*, 203 Cal.App.3d 656, for the proposition that a defendant's apparent control over the property is sufficient to create a special relationship even if the defendant did not actually own, possess, or control the property. *Southland* held that the evidence created a triable issue of fact as to whether the defendants actually exercised control over the property. (*Id*. at pp. 666–667; see *Alcaraz, supra*, 14 Cal.4th at p. 1163 [describing the reference to "commercial benefit" in *Southland* as "but one factor bearing upon the dispositive issue of whether the store exercised control over the adjacent property"].) References in the *Southland* opinion to "actual or apparent control" (*id*. at pp. 662, 664) are dicta and do not support the proposition that apparent control is sufficient. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620 ["[a]n appellate decision is not

17

Here, in contrast, USC did not exercise control over the property where the injury occurred. Unlike the defendants in *Alcaraz*, *supra*, 14 Cal.4th 1149, USC did not maintain and build a fence around the property. Unlike the defendant in *Southland*, *supra*, 203 Cal.App.3d 656, USC did not have a nonexclusive right to use the property, and its invitees did not regularly use the property. Although USC's policies governing use of alcohol and social events applied to SAE, those policies, along with DPS patrols to enforce those policies, did not constitute an exercise of control over the property. (*Rabel v. Illinois Wesleyan University* (1987) 161 Ill.App.3d 348, 360–361 (*Rabel*) [student injured during drunken fraternity prank at on-campus dormitory; university did not have special relationship with the plaintiff in that context despite the school's rules and regulations prohibiting alcohol consumption]; *A.M. v. Miami University* (Ohio 2017) 88 N.E.3d 1013, 1024 [plaintiff was sexually assaulted by fellow student at that student's off-campus dwelling and alleged that university knew of assailant's proclivities; university did not have a special relationship "with regard to its students which reached beyond university activities or premises under its possession or control"].)[12]

_____

authority for everything said in the court's opinion but only 'for the points actually involved and actually decided'".].)

[12] We note that *Regents* cited out-of-state cases in support of its holding that universities have a limited special relationship with their students. (*Regents*, *supra*, 4 Cal.5th at pp. 626–627.) We are free to cite both published and unpublished decisions from other jurisdictions and rely on them as persuasive authority. (*Lebrilla v. Farmers Group, Inc.* (2004) 119 Cal.App.4th 1070, 1077; *Brown v. Franchise Tax Board* (1987) 197 Cal.App.3d 300, 306, fn. 6.)

Barenborg also argues that USC had a special relationship with her because "security personnel hired by a business also have a special relationship with visitors to the property," citing *Marois v. Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193 (*Marois*).  In that case, a restaurant owner hired a private security firm to provide security at the restaurant.  After a security guard told a man to leave the restaurant, the man vandalized a kiosk in the parking lot using a baseball bat, began fighting with a patron, and when the plaintiff approached him struck the plaintiff with the bat.  (*Id*. at pp. 196–197.)  *Marois* stated that a security guard hired by a business has a special relationship with the business's customers and has a duty to protect those customers on the premises.  (*Id*. at pp. 199–200.)  The rule stated in *Marois* is inapplicable because USC did not possess or control the fraternity house, and did not hire security guards to provide security at the fraternity house.  (See *Titus v. Canyon Lake Property Owners Assn.* (2004) 118 Cal.App.4th 906, 912 (*Titus*) [homeowners association had no special relationship with either plaintiff or an inebriated driver despite having rules and regulations to protect persons on the property and hiring a security company].)

4.      *USC Did Not Have a Special Relationship with Cal. Gamma*

A defendant may have an affirmative duty to protect the plaintiff from the conduct of a third party if the defendant has a special relationship with the third party.  (*Regents*, *supra*, 4 Cal.5th at p. 619; *Tarasoff*, *supra*, 17 Cal.3d at p. 435.)  "[A] duty to control may arise if the defendant has a special relationship with the foreseeably dangerous person that entails an ability to control that person's conduct.  [Citation.]"  (*Regents*,

19

at p. 619.)  Examples of such a special relationship include the relationships between parent and child, psychotherapist and patient, and hospital and patient.  (*Ibid*.; *Tarasoff*, at p. 436.)

Barenborg argues that USC had a special relationship with Cal. Gamma and its members because USC had the ability to control the fraternity by enforcing the university's policies regarding alcohol use and social events.  She notes that one of the stated goals of USC's policies was to protect the campus community, including invitees to Greek Row.

The special relationship recognized in *Regents*, *supra*, 4 Cal.5th 607, was limited to enrolled students "while they are engaged in activities that are part of the school's curriculum or closely related to its delivery of educational services."  (*Id*. at p. 625.)  *Regents* noted that, unlike such curricular activities, "many aspects of a modern college student's life are, quite properly, beyond the institution's control.  Colleges generally have little say in how students behave off campus, or in their social activities unrelated to school.  It would be unrealistic for students to rely on their college for protection in these settings, and the college would often be unable to provide it."  (*Id*. at p. 626.)

These observations are relevant not only to the college-student relationship and the limited duty it supports, but also to the relationship between a college and fraternity members participating in off-campus social activities.  A college has little control over such noncurricular, off campus activities, and it would be unrealistic for students and their guests to rely on the college for protection in those settings.  (See *Pawlowski v. Delta Sigma Phi* (Conn.Super.Ct., Jan. 23, 2009, No. CV-03-0484661S) 2009 WL 415667, p. 6 ["As a practical matter, it may be

20

impossible for a university to police students' off-campus alcohol consumption"]; *A.M. v. Miami University*, *supra*, 88 N.E.3d at pp. 1024–1025 [university did not have a special relationship with student who sexually assaulted another student in off-campus attack; university's ability to discipline a student for off-campus conduct does not impose a duty to control the conduct of the student].)  The dependency and control that are characteristic of special relationships are absent in those circumstances.  We conclude that USC had no special relationship with Cal. Gamma or its members so as to give rise to a duty of care owed to guests at the party.

5.      *The Negligent Undertaking Doctrine Is Inapplicable*

The negligent undertaking theory of liability holds that a person who has no affirmative duty to act but voluntarily acts to protect another has a duty to exercise due care if certain conditions are satisfied.[13]  (*Delgado*, *supra*, 36 Cal.4th at p. 249; *Paz v. State of California* (2000) 22 Cal.4th 550, 558 (*Paz*).)

"The general rule is that a person who has not created a peril is not liable in tort for failing to take affirmative action to protect another unless they have some relationship that gives rise to a duty to act.  [Citation.]  However, one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking.  [Citation.]" (*Paz*, *supra*, 22 Cal.4th at pp. 558–559.)

"Our cases establish that a volunteer who, having no initial duty to do so, undertakes to provide protective services to

_____

[13]     The negligent undertaking doctrine is sometimes called the "Good Samaritan" rule, but is actually an exception to that rule. (*Delgado*, *supra*, 36 Cal.4th at p. 249, fn. 28.)

21

another, will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met: either (a) the volunteer's failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result." (*Delgado, supra*, 36 Cal.4th at p. 249.)

The foundational requirement for liability under a negligent undertaking theory is the undertaking of a task that the defendant allegedly performed negligently. (*Paz, supra*, 22 Cal.4th at p. 559.) The undertaking must be to render services that the defendant should recognize as necessary for the plaintiff's protection. (*Id.* at pp. 559–560; *Artiglio v. Corning, Inc.* (1998) 18 Cal.4th 604, 618 (*Artiglio*).) In addition to satisfying these requirements, the plaintiff also must satisfy one of two conditions: either (a) the defendant's failure to exercise reasonable care increased the risk of harm to the plaintiff, or (b) the plaintiff reasonably relied on the undertaking and suffered injury as a result.[14] (*Delgado, supra*, 36 Cal.4th at p. 249; *Williams, supra*, 34 Cal.3d at p. 23; Rest.3d Torts, *supra*, § 42; cf. *Paz, supra*, 36 Cal.4th at p. 560 [assuming the defendant

---

[14] The negligent undertaking doctrine encompasses both undertakings to render protective services to the plaintiff (Rest.2d Torts, § 323), as Barenborg claims here, and undertakings to render services to a third party to protect the plaintiff (Rest.2d Torts, § 324A). (*Delgado, supra*, 36 Cal.4th at p. 249, fn. 28.) Section 42 of the Restatement Third of Torts, Liability for Physical and Emotional Harm, replaces section 323 of the Restatement Second of Torts, and section 43 of the Third Restatement replaces section 324A of the Second Restatement. (Rest.3d Torts, *supra*, §§ 42, com. a, p. 92, 43, com. a, pp. 114–115.)

22

undertook to provide protective services, summary judgment was proper because the plaintiff could not establish any of the conditions for liability].)

Whether the defendant's undertaking, if proven, gave rise to a duty of care is a question of law for the court to decide. (*Artiglio*, *supra*, 18 Cal.4th at p. 615; *Peredia v. HR Mobile Services, Inc.* (2018) 25 Cal.App.5th 680, 700.) "[T]he scope of any duty assumed depends upon the nature of the undertaking." (*Delgado*, *supra*, 36 Cal.4th at p. 249.) *Delgado* stated that merely because a business proprietor "'chooses to have a security program' that includes provision of a roving security guard does not signify that the proprietor has assumed a duty to protect invitees from third party violence. [Citation.]" (*Id*. at pp. 249–250.)

Similarly here, we conclude that by adopting policies regarding alcohol use and social events and providing a security patrol both on and off campus, USC did not assume a duty to protect invitees from third-party conduct at fraternity parties. Again, a college has little control over such noncurricular, off campus activities, and it would be unrealistic for students and their guests to rely on the college for protection in those settings.

These considerations support the conclusion not only that there was no special relationship, but also that by adopting those measures to promote safety and a suitable learning environment, USC did not assume a duty to protect guests at off-campus fraternity parties from the conduct of other guests. (See *Mynhardt v. Elon University* (2012) 220 N.C.App. 368, 375 [by adopting rules and regulations on alcohol use, university did not assume a duty to protect student from injury at an off-campus fraternity party]; *Rabel*, *supra*, 161 Ill.App.3d at pp. 362–363 [by

23

equipping its buildings with security devices and employing security guards, university did not assume a duty to protect students from criminal attacks]; *Titus, supra*, 118 Cal.App.4th at p. 912 [by adopting rules and regulations to protect persons on the property and hiring a security company, homeowners association did not create a duty to protect residents from an inebriated driver]; cf. *Coghlan v. Beta Theta Pi Fraternity* (1999) 133 Idaho 388, 400, [university assumed a duty to protect a student because two university employees were present to *supervise* a fraternity party and should have known that the student was intoxicated].)

Moreover, the evidence here cannot support an inference that USC's conduct increased the risk of harm to Barenborg. By establishing policies governing fraternities, providing a security patrol with authority to enforce those policies both on and off campus, and failing to enforce those policies by shutting down the Cal. Gamma party after it began or preventing the party from occurring in the first place, USC did not create any new peril. USC's failure to prevent or curtail the party allowed the party to occur and continue, but neither created the party nor increased the risks inherent in the party.[15]

A defendant does not increase the risk of harm by merely failing to eliminate a preexisting risk. (*Paz, supra*, 22 Cal.4th at p. 560 ["a failure to alleviate a risk cannot be regarded as tantamount to increasing that risk"]; *Williams, supra*, 34 Cal.3d at p. 27 [highway patrol officers assisting an injured driver "took

_____

[15]     USC had no opportunity to prevent the party from taking place because Cal. Gamma did not request permission before hand, as required by the rules. There is no evidence that USC had any prior knowledge the party would take place.

24

no affirmative action which contributed to, increased, or changed the risk which would have otherwise existed"]; *City of Santee v. County of San Diego* (1989) 211 Cal.App.3d 1006, 1016 ["nonfeasance which results in failure to eliminate a preexisting risk is not equivalent to nonfeasance which increases a risk of harm"]; see *Pawlowski v. Delta Sigma Phi*, *supra*, 2009 WL 415667, p. 4 [university's alleged failure to enforce its own policies and failure to supervise off-campus alcohol use did not increase the risk of harm].) Barenborg's argument that USC's failure to effectively discipline the fraternity for prior unauthorized parties emboldened the fraternity, causing it to hold another unauthorized party with more dangerous conduct is mere speculation without evidentiary support.

The evidence here also cannot support an inference that Barenborg actually or reasonably relied on USC to protect her from harm. Despite her deposition testimony that she relied on DPS to protect her,[16] there is no indication that her awareness of the existence of DPS caused her to behave any differently. (*Williams* , *supra* , 34 Cal.3d at p. 28 [plaintiff must show detrimental reliance on defendant's conduct "which induced a false sense of security and thereby worsened her position"].) The evidence also does not support her claim that any reliance was reasonable. Barenborg acknowledged that the party was "very large, very crazy, packed and crowded," and there was no visible security or control. Alcohol was plentiful. Barenborg had already consumed cocaine and several alcoholic drinks. She stepped onto a makeshift raised platform to dance with her friends amid other

---

[16] In her deposition, Barenborg answered "Yes" to the question, "Prior to your injury, did you rely on the USC Department of Public Safety officers to protect you?"

partygoers and was bumped off the platform and fell to the ground. In these circumstances, any reliance on USC or DPS to protect her from harm was unreasonable. (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 ["'whether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts'"].)

6.      *Consideration of the Rowland Factors Does Not Support a Duty of Care*

        Courts weigh several factors in determining whether to recognize an exception to the general duty under Civil Code section 1714, subdivision (a) to exercise ordinary care. Those factors include, "'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.'" (*Regents*, *supra*, 4 Cal.5th at p. 628, quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 113.)

        An analysis of the *Rowland* factors may be unnecessary if the court determines as a matter of law based on other policy considerations that no duty exists in a category of cases. (See *Zelig*, *supra*, 27 Cal.4th at pp. 1128–1131 [found no special relationship and no negligent undertaking upon which to base a duty of care without a *Rowland* analysis]; *Hoff v. Vacaville Unified School Dist.* (1998) 19 Cal.4th 925, 933–937 [held the special relationship between a school district and a student did

26

not create a duty of care toward nonstudents endangered by student conduct without a *Rowland* analysis]; *Williams*, *supra*, 34 Cal.3d at pp. 27–28 [found no special relationship and no negligent undertaking upon which to base a duty of care without a *Rowland* analysis]; *Suarez v. Pacific Northstar Mechanical, Inc.* (2009) 180 Cal.App.4th 430, 438 [because the balancing of factors has already been performed in establishing the common law rule that there is no duty to come to the aid of another absent a special relationship, it is unnecessary to analyze the *Rowland* factors in each case]; *Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1203 [same]; *Eric J. v. Betty M.* (1999) 76 Cal.App.4th 715, 729–730 [same].)

In any event, some courts have considered the *Rowland* factors despite concluding that there was no special relationship and no duty, with the *Rowland* analysis supporting the conclusion of no duty. (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 296–299; *Conti v. Watchtower Bible & Tract Society of New York, Inc.* (2015) 235 Cal.App.4th 1214, 1227–1230.) We do so here, and conclude that under *Rowland* USC did not owe Barenborg a duty of care.

The *Rowland* factors, "must be 'evaluated at a relatively broad level of factual generality.' [Citation.] In considering them, we determine 'not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.' [Citation.] In other words, the duty analysis is categorical, not case-specific. [Citation.]" (*Regents*, *supra*, 4 Cal.5th at pp. 628–629.)

27

"The *Rowland* factors fall into two categories.  The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant.  The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability.  The policy analysis evaluates whether certain kinds of plaintiffs or injuries should be excluded from relief.  [Citation.]" (*Regents*, *supra*, 4 Cal.5th at p. 629.)

"'[A]s to foreseeability, . . . the court's task in determining duty "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed . . . ."'  [Citations.]" (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1145 (*Kesner*).)

The foreseeability question here is whether it is reasonably foreseeable that a university's failure to enforce policies governing alcohol use and social events could result in harm to a person attending a fraternity party.  (Cf. *Regents*, *supra*, 4 Cal.5th at p. 629; *Cabral*, *supra*, 51 Cal.4th at p. 775.)  It is not uncommon for college students drinking alcohol at a fraternity party to behave in a manner that is careless and threatens injury to themselves or others.  The possibility of injury at such a party unrestrained by sensible rules and enforcement is reasonably foreseeable.

The second factor, "the degree of certainty that the plaintiff suffered injury" (*Rowland*, *supra*, 69 Cal.2d at p. 113), ordinarily is significant only when the claimed injury is intangible, such as emotional distress. (*Regents*, *supra*, 4 Cal.5th at p. 630; *Kesner*,

28

*supra*, 1 Cal.5th at p. 1148.)  Barenborg's physical injuries are certain, so the certainty of injury is not a relevant factor.

"The third factor, 'the closeness of the connection between the defendant's conduct and the injury suffered' [citation], is 'strongly related to the question of foreseeability itself' [citation], but it also accounts for third-party or other intervening conduct. [Citation.]  Where the third party's intervening conduct is foreseeable or derivative of the defendant's conduct, then that conduct does not '"diminish the closeness of the connection between defendant's conduct and plaintiff's injury. . . ."' [Citation.]"  (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1086 (*Vasilenko*).)

In *Regents*, the university's failure to prevent a violent assault in the classroom was closely connected to the plaintiff's injury because the university was aware of the risk that the particular student would commit a violent assault against another student.  (*Regents*, *supra*, 4 Cal.5th at p. 631 ["[w]hen circumstances put a school on notice that a student is at risk to commit violence against other students, the school's failure to take appropriate steps to warn or protect foreseeable victims can be causally connected to injuries the victims suffer as a result of that violence"].)

The defendant in *Vasilenko* was a church that maintained an overflow parking lot across the street from its chapel.  The plaintiff was directed to park there by church volunteers and was struck by a car while crossing the street on his way to a church function.  *Vasilenko* held that a landowner does not have a duty of care to assist invitees in crossing a public street when the landowner does nothing to obscure or magnify the dangers of crossing the street.  (*Vasilenko*, *supra*, 3 Cal.5th at p. 1081–1082.)

29

Regarding the closeness of the connection between the defendant's conduct and the plaintiff's injury, *Vasilenko* stated: "unless the landowner impaired the driver's ability to see and react to crossing pedestrians, the driver's conduct is independent of the landowner's. Similarly, unless the landowner impaired the invitee's ability to see and react to passing motorists, the invitee's decision as to when, where, and how to cross is also independent of the landowner's. Because the landowner's conduct bears only an attenuated relationship to the invitee's injury, we conclude that the closeness factor tips against finding a duty." (*Id.* at p. 1086.)

The intervening conduct here involved Cal. Gamma hosting an unauthorized party, serving alcohol, and erecting an unsafe dance platform; Barenborg attending the party under the influence of cocaine and alcohol; and Barth bumping Barenborg off the platform, whether negligently or intentionally. As in *Vasilenko*, *supra*, 3 Cal.5th 1077, USC did nothing to increase the risks inherent in the activity here—attending a fraternity party. The conduct of Cal. Gamma, Barenborg, and Barth was independent of USC's conduct in failing to enforce its policies governing alcohol use and social events. The attenuated connection between USC's failure to enforce its policies and the independent conduct by Cal. Gamma, Barenborg, and Barth weighs against finding a duty. (Cf. *id.* at p. 1086.)

*Regents* stated regarding moral blame: "'We have previously assigned moral blame, and we have relied in part on that blame in finding a duty, in instances where the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue.' [Citation.] With the decline of colleges'

in loco parentis role, adult students can no longer be considered particularly powerless or unsophisticated." (*Regents*, *supra*, 4 Cal.5th at p. 631.) Because adult students, whether they attend USC or another university, cannot be considered particularly powerless or unsophisticated and because universities have little control over students' off-campus social activities (*Ibid*), we conclude that USC's conduct in failing to enforce its policies and more closely monitor off-campus fraternity parties was not particularly blameworthy.

"The policy of preventing future harm is ordinarily served by allocating costs to those responsible for the injury and best suited to prevent it. [Citation.] 'In general, internalizing the cost of injuries caused by a particular behavior will induce changes in that behavior to make it safer. That consideration may be "outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability." [Citation.]' [Citation.]" (*Vasilenko*, *supra*, 3 Cal.5th at p. 1087.) Because colleges' control of off-campus social activities is limited, their ability to reduce the risk of injury in those settings is limited. (Cf. *ibid*. ["[t]he ability of landowners to reduce the risk of injury from crossing a public street is limited"].)

In contrast to colleges, fraternities hosting parties in fraternity houses and the invitees themselves have much greater control over conduct at those parties and a more direct ability to reduce the risk. (Cf. *Vasilenko*, *supra*, 3 Cal.5th at p. 1090 ["other entities such as the government, drivers, and invitees themselves have much greater and more direct ability to reduce that risk"].)

31

Moreover, finding a duty in these circumstances could create a disincentive for universities to regulate alcohol use and social activities and provide security patrols, which to some degree could frustrate the policy of preventing future harm. (See *Pawlowski v. Delta Sigma Phi, supra*, 2009 WL 415667, p. 6 [finding an assumed duty based on university policies to curb alcohol abuse might discourage the adoption of such policies, which is undesirable]; *Mynhardt v. Elon University, supra*, 220 N.C.App. at p. 375 [same].) In light of these considerations, we conclude that the policy of reducing future harm weighs against imposing a duty on colleges.

Regarding the burden on the defendant and the community, effective control of off-campus fraternity parties, if achievable, would require close monitoring and considerable resources. The burden on the university and the restrictions on the independence of students engaging in noncurricular activities off campus would be great. (Cf. *Baldwin, supra*, 123 Cal.App.3d at p. 291 ["'The college . . . has an interest in the nature of its relationship with its adult students, as well as an interest in avoiding responsibilities that it is incapable of performing'"]; *Tanja H., supra*, 228 Cal.App.3d at p. 438 ["onerous rconditions" on students' "freedom and privacy" would be "incompatible with a recognition that students are now generally responsible for their own actions and welfare"].)[17]

---

[17]    *Regents* disapproved *Baldwin, supra*, 123 Cal.App.3d 275, *Tanja H., supra*, 228 Cal.App.3d 434, and other opinions only to the extent they were inconsistent with its holdings concerning the special relationship between colleges and students, or colleges' duty of care. (*Regents, supra*, 4 Cal.5th at p. 634, fn. 7.) The holdings in *Regents* were limited to finding a special

Finally, although there is no evidence in the record regarding the availability and cost of insurance for the risk involved, USC "has offered no reason to doubt colleges' ability to obtain coverage for the negligence liability under consideration." (*Regents*, *supra*, 4 Cal.5th at p. 633.)

We conclude that the *Rowland* factors, on balance, weigh against imposing a duty on USC to protect a fraternity's invitees from the risk of harm at an off-campus fraternity party. The lack of a close connection between USC's conduct and Barenborg's injury, the relatively low moral blame, the policy of preventing future harm, and the burden on colleges and students that would arise by imposing a duty, all weigh against finding a duty.

---

relationship between colleges and enrolled students participating in curricular activities and a duty of care to protect students from foreseeable acts of violence in the classroom and during curricular activities. (*Id*. at pp. 626–627.) Some of *Baldwin*'s and *Tanja H*'s statements concerning the college-student relationship remain relevant and viable with respect to noncurricular activities.

## DISPOSITION

The petition is granted.  Let a peremptory writ of mandate issue directing the trial court to vacate its order denying USC's motion for summary judgment and enter a new order granting the motion.  USC is entitled to recover its costs in this appellate proceeding.


MICON, J.*

We concur:


MANELLA, P. J.          COLLINS, J.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 12/19/18

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| UNIVERSITY OF SOUTHERN CALIFORNIA,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>Respondent;<br><br>CARSON BARENBORG,<br><br>Real Party in Interest. | B288180<br><br>(Los Angeles County<br>Super. Ct. No. BC597033)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:*

The opinion in the above-entitled matter, filed on November 27, 2018, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be certified for publication in its entirety in the Official Reports and it is so ordered.

_____

*MANELLA, P. J.          COLLINS, J.          MICON, J.**

_____

**Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

1